647 F.2d 796
 IOWA POWER AND LIGHT COMPANY, a Corporation, Appellant,
v.
BURLINGTON NORTHERN, INC., a Corporation, Appellee.
IOWA POWER AND LIGHT COMPANY, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
and
Burlington Northern, Inc., Intervenor-Respondent (two cases).
IOWA POWER AND LIGHT COMPANY, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Burlington Northern, Inc., Intervenor-Respondent.
BURLINGTON NORTHERN, INC., Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Iowa Power and Light Company, Intervenor-Respondent.
 Nos. 79-1676, 80-1914, 80-1915 and 80-1959.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 9, 1980.
Decided April 27, 1981.
 
 Curtis H. Berg, Alan R. Post, St. Paul, Minn., Howard J. Trienens, Richard J. Metzger, Chicago, Ill., Albert E. Schoenbeck, St. Louis, Mo., R. Eden Martin, Richard E. Young, Washington, D. C., for Railroad petitioner.
 Lynn K. Vorbrich, Curtis L. Ritland, Iowa Power and Light Co., Des Moines, Iowa, John M. Cleary, Frederic L. Wood, Nicholas J. DiMichael, Donelan, Cleary, Wood & Maser, P. C., Washington, D. C., William E. Franke, Clayton, Mo., for Iowa Power and Light.
 Sanford M. Litvack, Asst. Atty. Gen., John J. Powers, III, Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D. C., Richard A. Allen, Kathleen M. Dollar, Deputy Associate General Counsel, Evelyn G. Kitay, Atty., Interstate Commerce Commission, Washington, D. C., for ICC and United States.
 Thomas L. Croft, St. Louis, Mo., W. Don Brittin, Jr., Randall G. Horstmann, Des Moines, Iowa, Louis A. Harris, St. Paul, Minn., for Burlington Northern; Coburn, Croft & Putzell, St. Louis, Mo., Nyemaster, Goode, McLaughlin, Emery & O'Brien, Des Moines, Iowa, of counsel.
 John M. Cleary, Frederic L. Wood, Nicholas J. DiMichael, Donelan, Cleary, Wood & Maser, Washington, D. C., William E. Franke, Clayton, Mo., Lynn K. Vorbrich, Curtis L. Ritland, Iowa Power & Light Co., Des Moines, Iowa, John A. McClintock, David L. Brown, Hansen, McClintock & Riley, Des Moines, Iowa, for Iowa Power & Light Co.
 Before LAY, Chief Judge, and ROSS and HENLEY, Circuit Judges.
 HENLEY, Circuit Judge.
 
 
 1
 Burlington Northern, Inc. (Burlington Northern or BN) brings this petition to review orders[1] of the Interstate Commerce Commission (ICC or Commission) which prescribe a maximum reasonable rate for the transportation of coal from Belle Ayr, Wyoming to Council Bluffs, Iowa. In the decision which is the focus of this appeal, I & S 9199, Unit Train Rates on Coal Burlington Northern, Inc., 364 ICC 186 (1980), the Commission prescribed a transportation rate which holds Burlington Northern to a rate negotiated in 1973 with the Iowa Power and Light Company (Iowa Power or IPL). In this decision, served on October 1, 1980 (the "October 1 decision"), the Commission reversed an earlier ruling which refused to give weight to the parties' agreement. I & S 9199, Unit Train Rates on Coal Burlington Northern, Inc., 361 ICC 655 (1979).
 
 
 2
 For the reasons stated below, we deny the petition for review.
 
 I. BACKGROUND
 
 3
 The Iowa Power and Light Company is engaged in the sale and generation of electricity in the State of Iowa. The utility maintains a coal-fired generating plant at Council Bluffs, Iowa, which is supplied under a twenty-year supply contract with coal from Belle Ayr, Wyoming.
 
 
 4
 IPL announced its plans to construct the generating plant at Council Bluffs in 1972, and began at that time to negotiate for coal supply and transportation. In 1973 the utility and the Amax Coal Company joined in a statement of intent under which Iowa Power would purchase thirty-five million tons of coal from Amax over the term of the arrangement. IPL then commenced negotiating with Burlington Northern, the only rail line serving the Amax mine at Belle Ayr, Wyoming.
 
 
 5
 On July 10, 1973 BN quoted a unit train rate of $3.21 per net ton in shipper-owned cars, which was accepted by Iowa Power on July 25, 1973. From this date until early 1976 the railroad and the utility had several meetings concerning the contemplated movement, but neither side questioned the level of the $3.21 rate. Negotiations continued, however, because no agreement had been reached on how the rate would be adjusted in the future as costs increased. Meanwhile, IPL in November, 1973 entered into a contract with Amax Coal Company for the supply of coal. Finally, on January 7, 1976, BN sent to IPL a letter of understanding, incorporating the parties' consensus regarding the base rate for coal transportation and a rate escalation formula. IPL signed the letter on February 16, 1976.
 
 
 6
 In 1977 IPL gave notice to BN that coal movements would commence on January 1, 1978. As this date approached, however, Burlington Northern in December, 1977 advised IPL that it would not publish the agreed rate[2] of $5.23 because several recent coal rate adjustments approved by the Commission made it appear that this rate was beneath the going pattern of rates. Burlington Northern offered to publish a rate of $6.32 and to hold this rate until July 1, 1979. Iowa Power in turn insisted that BN honor the agreed rate.
 
 
 7
 This impasse was followed by Burlington Northern's unsuccessful attempt, not directly relevant here, to publish a capital incentive rate of $7.38. The Commission found that the proposed rate did not qualify for capital incentive treatment, Incentive Rate on Coal Belle Ayr, Wyoming to Council Bluffs, Iowa, 359 ICC 201 (1978), and the parties were once again left to negotiate their differences.[3]
 
 
 8
 Ultimately BN elected to file the same $7.38 rate under normal statutory notice provisions. This increase is the subject of the present petition for review.
 
 
 9
 The proposed $7.38 rate was kept from becoming effective pending investigation by Iowa Power's filing of a petition for suspension and investigation (I & S Docket No. 9199) and a complaint (Docket No. 36944) under the provisions of 49 U.S.C. § 10707.[4] Pending investigation Burlington Northern was allowed to establish a rate no higher than $5.62, that is, the contract rate as increased by the parties' agreed cost escalation formula.
 
 
 10
 In decisions dated July 6 and July 13, 1979 the ICC concluded that BN's $7.38 rate was unlawfully high. Docket No. I & S 9199, Unit Train Rates on Coal Burlington Northern, Inc., 361 ICC 655 (1979). Significantly, the Commission declined to hold BN to the parties' agreed rate, prescribing instead as a reasonable maximum rate the above-contract rate of $7.25 per net ton.
 
 
 11
 Petitions for judicial review followed,[5] with eventual consolidation of the appeals in this court. While these petitions were pending, however, the Commission sought and the court on May 7, 1980 granted a remand to the Commission, giving the ICC an opportunity to reexamine its findings in light of its policy on negotiated ratemaking.
 
 
 12
 The order which is the focus of the present review is the product of this remand. The Commission by order served on October 1, 1980 found that it had erred in July, 1979 in prescribing $7.25 as a maximum reasonable rate without giving weight to the parties' agreement. The Commission found instead that the agreed rate was a just and reasonable maximum. I & S 9199, supra, 364 ICC at 200.
 
 
 13
 Both parties petitioned for review of the ICC's October 1, 1980 decision.[6] The United States and Interstate Commerce Commission are respondents pursuant to 28 U.S.C. § 2322 and Fed.R.App.P. 15(a). This court has jurisdiction under 28 U.S.C. §§ 2321(a), 2342(5) as amended by Pub.L.No. 93-584, 88 Stat. 1917 (1975), and 2344.
 
 
 14
 On review, objections are raised to (A) the Commission's jurisdiction under the Staggers Rail Act of 1980; (B) the enforcement of a private agreement as outside of the ICC's authority and contrary to decisional precedent; (C) the Commission's finding that the parties intended to be bound; (D) the violation of statutory ratemaking guidelines; and (E) the Commission's promulgation of a new policy on contract rates without notice and comment.
 
 II. DISCUSSION
 
 15
 A. Jurisdiction under the Staggers Rail Act of 1980[7]
 
 
 16
 BN raises a jurisdictional issue of first impression: whether the Staggers Rail Act of 1980, Pub.L.No. 96-448, 94 Stat. 1895 (1980) (the Staggers Rail Act or the Act) deprived the Commission of jurisdiction to compel a rate reduction in its decision of October 1, 1980.[8]
 
 
 17
 Burlington Northern argues that the ICC lacked jurisdiction to enter its October 1, 1980 order,[9] relying on the following provision of Section 202 of the Staggers Rail Act:
 
 
 18
 (T)he Commission shall find that the rail carrier establishing the challenged rate does not have market dominance over the transportation to which the rate applies if such rail carrier proves that the rate charged results in a revenue-variable cost percentage for such transportation that is less than
 
 
 19
 (A) 160 percent during the period beginning on the effective date of the Staggers Rail Act of 1980 and ending September 30, 1981.
 
 
 20
 Pub.L.No. 96-448, 94 Stat. 1900 (1980), to be codified at 49 U.S.C. § 10709(d).
 
 
 21
 This provision relating to market dominance is best comprehended against the background of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L.No. 94-210, 90 Stat. 31 (1976) (the 4-R Act). In the 4-R Act, Congress set forth market dominance as a novel test for the Commission's jurisdiction over a challenged rate. Section 202 of the 4-R Act, recodified as part of the Revised Interstate Commerce Act, Pub.L.No. 95-473, 92 Stat. 1382 (1978), 49 U.S.C. § 10709(b), provides that the Commission has no jurisdiction over a rate in circumstances where the rail carrier lacks market dominance. Regulation of rates in such competitive circumstances is left to market forces.
 
 
 22
 The Staggers Rail Act continues the deregulation of rail traffic begun by the 4-R Act, providing in Section 202 a presumption against market dominance where the rail carrier's revenues from the transportation at issue do not exceed variable costs by at least 160 percent.
 
 
 23
 Burlington Northern contends that the agreement rate ordered by the Commission in its October 1, 1980 decision will provide revenues that are 123 percent of variable costs plus additives.[10] This 123 percent figure is far below the 160 percent ratio needed to trigger the ICC's jurisdiction under the Staggers Rail Act. Accordingly, Burlington Northern argues, the Commission had no jurisdiction to issue its October 1 decision or to order the agreement rate of $5.62 as a reasonable maximum.
 
 
 24
 While Burlington Northern argues that Section 202 controls, the ICC contends that another section of the Staggers Rail Act, Section 208, governs the jurisdictional issue. Section 208 addresses negotiated ratemaking and authorizes rail carriers to enter into privately negotiated contracts for rail services. In subsection (j), which is directly relevant here, Congress addressed the status of contracts already in effect as of the effective date of the Staggers Rail Act, as follows:
 
 
 25
 The provisions of this section shall not affect the status of any lawful contract between a rail carrier and one or more purchasers of rail service that is in effect on the effective date of the Staggers Rail Act of 1980. Any such contract shall hereafter have the same force and effect as if it had been entered into in accordance with the provisions of this section. Nothing in this section shall affect the rights of the parties to challenge the existence of such a contract.
 
 
 26
 Pub.L.No. 96-448, 94 Stat. 1909-10 (1980) to be codified at 49 U.S.C. § 10713(j).
 
 
 27
 The Commission contends that this subsection preserves the contract rights of parties, such as Iowa Power, who negotiated rate agreements prior to enactment of the Staggers Rail Act. The Commission argues, in other words, that Section 208 takes precedence over Section 202. Allegedly, Section 208 creates a limited category of pre-Staggers Rail Act rate agreements over which the Commission has continuing jurisdiction regardless of the jurisdictional threshold set forth in Section 202.
 
 
 28
 We believe that the parties' respective reliance on Sections 202 and 208 is misplaced. Both BN and the ICC assume that the Staggers Rail Act applies here, although with disagreement as to which section of the Act determines the ICC's jurisdiction. We conclude to the contrary that the Staggers Rail Act is not applicable.[11]
 
 
 29
 We base our conclusion on three grounds: (i) the Staggers Rail Act does not alter the provision of 49 U.S.C. § 10709(b) requiring a ninety day determination of market dominance; (ii) the legislative history of the Staggers Rail Act directs that case law should determine the effect of the Act on pending cases; and (iii) case law teaches that new legislation should not be applied to pending cases where manifest injustice would result.
 
 
 30
 (i) The Ninety Day Provision of 49 U.S.C. § 10709(b)
 
 
 31
 We begin our analysis from the premise that the new provisions of the Staggers Rail Act pertaining to market dominance must be integrated with existing statutory provisions, particularly those of the 4-R Act. We view as crucial the relationship between 49 U.S.C. § 10709(b ) and the new provisions of Section 202 of the Staggers Rail Act, 49 U.S.C. § 10709(d ).
 
 
 32
 The 4-R Act directed the Commission to render a determination on market dominance "within 90 days after the start of a proceeding under section 10707." 49 U.S.C. § 10709(b). The new presumption against market dominance provided by the Staggers Rail Act in 49 U.S.C. § 10709(d) is presumably intended to operate within the established ninety day period. Cf. Burlington Northern, Inc. v. United States, 555 F.2d 637, 640 (8th Cir. 1977) (ninety day language of 49 U.S.C. § 10709(b) was determinative of the time at which new market dominance standards promulgated by the Commission would apply). In effect, therefore, the Act's 160 percent jurisdictional threshold will apply (1) in proceedings begun on or after effective date of the Act, in which the ninety day period for a market dominance determination has not begun to run, and (2) in those few proceedings begun before the effective date of the Act in which the ninety day period for a jurisdictional determination still pends. This is not such a case.
 
 
 33
 Here, a finding of market dominance was entered by the Commission's Suspension and Fourth Section Board in 1978 and was affirmed by the full Commission in its July 13, 1979 decision, well before the effective date of the Staggers Rail Act. I & S 9199, supra, 361 ICC at 671, 687. The Commission reaffirmed its finding of market dominance in its October 1, 1980 decision. I & S 9199, supra, 364 ICC at 201, App. A. To require a reassessment of market dominance at this late date would contravene the express statutory dictate that market dominance be determined within 90 days of the start of a proceeding. We find no indication that Congress, by setting a jurisdictional threshold in the Staggers Rail Act, intended to alter the ninety day rule.
 
 
 34
 (ii) Legislative History
 
 
 35
 The legislative history of the Staggers Rail Act further supports a prospective application of the legislation. The House Conference Report indicates that case law should control the effect of the Act on existing cases. House Conf.Rep.No.96-1430, 96th Cong., 2d Sess. at 142 (1980), reprinted in (1980) U.S.Code Cong. & Ad.News, 7378, 7510, 7574.[12] Although decision law is not free from ambiguity, we conclude that prospective application is suggested by case precedent.
 
 
 36
 (iii) Case Law
 
 
 37
 We acknowledge that case law looks both ways. In favor of retroactive application of the Staggers Rail Act is the principle that a court must apply the law in effect at the time of its decision.[13] Bradley v. School Board of Richmond, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); Thorpe v. Housing Authority of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); Bruner v. United States, 343 U.S. 112, 72 S.Ct. 581, 96 L.Ed. 786 (1952); Insurance Co. v. Ritchie, 5 Wall. 541, 18 L.Ed. 540 (1866); United States v. Schooner Peggy, 1 Cranch 103, 2 L.Ed. 49 (1801). On the other hand, exception to this principle has been recognized where application of the intervening law would result in manifest injustice. Bradley v. School Board of Richmond, supra, 416 U.S. at 716, 94 S.Ct. at 2018; Thorpe v. Housing Authority of Durham, supra, at 282, 89 S.Ct. at 526; Greene v. United States, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); Arkoosh v. Dean Witter & Co., 571 F.2d 437 (8th Cir. 1978) (per curiam). We conclude that the manifest injustice exception as explicated by the Supreme Court in Bradley v. School Board of Richmond, supra, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476, pertains here.
 
 
 38
 The Bradley opinion identifies three factors which are pertinent to the exception: "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." 416 U.S. at 717, 94 S.Ct. at 2019.
 
 
 39
 In discussing the first factor, the Supreme Court has distinguished litigation involving "great national concerns," and parties who are public entities, from private cases between individuals. Id. at 718-19, 94 S.Ct. at 2019-20, citing Schooner Peggy, supra, 1 Cranch at 110. Where only private entities are involved, as here, the courts are admonished to "struggle hard against a construction which will, by a retrospective operation, affect the rights of parties." Id. at 717, 94 S.Ct. at 2019, citing Schooner Peggy, supra, 1 Cranch at 110.
 
 
 40
 Admittedly, Congress in the Staggers Rail Act addressed matters of national concern, namely the deterioration of the nation's rail system and the need to preserve a financially stable system in the private sector of the economy. House Conf.Rep. 96-1430, 96th Cong., 2d Sess. at 79-80 (1980), reprinted in (1980) U.S.Code Cong. & Ad.News at 7510-11. These national concerns encourage, to some extent, retroactive application of the legislation.
 
 
 41
 However, the national objective of revenue adequacy for the nation's railroads can be achieved in the present instance without impairment of the parties' rights through retroactive application of the new law. The agreed rate will fully compensate BN at the revenue need level. See Section D, infra. Under Bradley, the rights of the parties should not be disturbed by retroactive application of the Staggers Rail Act where the national concerns of the legislation will be met without such retroactivity.
 
 
 42
 The second factor cited in Bradley provides further argument against retroactive application of the Staggers Rail Act. Concerning the "nature of the rights affected," the Bradley court noted that it would refuse to apply an intervening change in law to a pending action where to do so would infringe upon a right that had matured or become unconditional. Id. at 720, 94 S.Ct. at 2020, citing Greene v. United States, supra, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576; Claridge Apartments Co. v. Commissioner, 323 U.S. 141, 65 S.Ct. 172, 89 L.Ed. 139 (1944); Union Pacific R.R. v. Laramie Stock Yards Co., 231 U.S. 190, 34 S.Ct. 101, 58 L.Ed. 179 (1913).
 
 
 43
 Here, Iowa Power's right to contest the Council Bluffs rate in ICC proceedings matured with the Commission's finding of market dominance. The utility's right to ship coal at the agreed rate matured under the Commission's October 1, 1980 decision, on the effective date of the Staggers Rail Act.[14] Cf. Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 567 F.2d 1174, 1180 n.6 (2d Cir. 1977) (injustice resulting from retroactive application of new law depends upon the stage to which litigation has progressed).
 
 
 44
 Finally, the Bradley court indicated that manifest injustice would be measured by the nature of the impact of the new law on existing rights. Stated another way, the Court thought that manifest injustice would stem from the imposition of new and unanticipated obligations on a party without notice or an opportunity to be heard. Id. at 720, 94 S.Ct. at 2020. Here, insofar as application of the Staggers Rail Act might operate[15] to deprive the Commission of jurisdiction, Iowa Power could be forced to begin litigating its contract anew before the courts.[16] Such an exercise would vastly increase the burden on Iowa Power in the context of a case that began more than two and one-half years ago and that has already seen one judicial remand to the Commission. Litigation before the ICC, which had progressed to a final decision on the effective date of the Staggers Rail Act, would be rendered futile.
 
 
 45
 Given these considerations, this is clearly an instance in which the manifest injustice exception precludes application of the Act. Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, 567 F.2d 1174; Monell v. Department of Social Services, 532 F.2d 259 (2d Cir. 1976), rev'd on other grounds, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Coe v. Secretary of Health, Education & Welfare, 502 F.2d 1337 (4th Cir. 1974); cf. Flanigan v. Burlington Northern, Inc., 632 F.2d 880 (8th Cir. 1980), cert. denied, -- U.S. --, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981).
 
 
 46
 B. The Legality and Enforceability of Private Contracts
 
 
 47
 Given ICC jurisdiction over the Council Bluffs rate, BN argues in the alternative that the Commission erred under pre-Staggers Act decisional law in prescribing the agreed rate as a reasonable maximum.
 
 
 48
 BN first maintains that under the Interstate Commerce Act prior to Staggers Rail Act amendments, contract rates were unenforceable. The railroad relies principally on American Broadcasting Companies, Inc. v. FCC, 643 F.2d 818 (D.C.Cir.1980), and on a line of precedent discussed at length therein. Id. at 822, citing Armour Packing Co. v. United States, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908); Aero Trucking, Inc. v. Regal Tube Co., 594 F.2d 619 (7th Cir. 1979); Illinois Central Gulf R.R. v. Golden Triangle Wholesale Gas Co., 586 F.2d 588 (5th Cir. 1978); Farley Terminal Co. v. Atchison, T. & S. F. Ry., 522 F.2d 1095 (9th Cir.), cert. denied, 423 U.S. 996, 96 S.Ct. 423, 46 L.Ed.2d 370 (1975).
 
 
 49
 These decisions recognize that the ICC is charged by statute with eliminating preferential and discriminatory rates. Accordingly, the cited cases hold that parties cannot by their own secret or preferential agreement alter the enforceability of a rate that has been approved by the ICC.
 
 
 50
 This precedent is inapplicable here. The determinative feature of the cited cases is a conflict between the duly filed rate approved by the regulatory agency, and a different rate arising from a private agreement, rate representation, or equitable consideration. In such circumstances, the established tariff rate, approved by the ICC, must prevail. Armour Packing Co. v. United States, supra, 209 U.S. at 81-82, 28 S.Ct. at 435-36; Farley Terminal Co. v. Atchison, T. & S. F. Ry., supra, 522 F.2d 1095; Chicago, B. & Q. R.R. v. Ready Mixed Concrete Co., 487 F.2d 1263 (8th Cir. 1973).
 
 
 51
 Here, by contrast, the ratemaking authority of the regulatory agency is not threatened by attempts to enforce a rate other than the legal tariff. Rather, under the terms of the Commission's October 1, 1980 decision, the parties' contract rate and the rate approved as a reasonable maximum by the ICC through normal statutory procedures are the same.[17] Cf. American Broadcasting Companies, Inc. v. FCC, supra, 643 F.2d 818, at 825 (expressly declining to construe the situation before the court as one of consistency between a private contract and the effective tariff approved by the regulatory agency). A need to protect the authority of the regulatory agency against rights arising from a private agreement accordingly cannot provide the basis for nonenforcement of the parties' agreement here.
 
 
 52
 Burlington Northern further argues that contract rates were illegal per se under ICC decisional law prior to the Commission's issuance of a new policy on contract rates in 1978.[18] Citing National Gypsum Co. v. United States, 353 F.Supp. 941, 949 (W.D.N.Y.1973); Great Lakes Ship Owners Association v. Chicago & N. W. Ry., 337 ICC 287, 293 (1970); Guaranteed Rates from Sault Ste. Marie, Ontario to Chicago, 315 ICC 311, 323 (1961); Contract Rates on Rugs & Carpeting from Amsterdam, N.Y. to Chicago, 313 ICC 247 (1961), aff'd New York Central R. R. v. United States, 194 F.Supp. 947 (S.D.N.Y.1961), aff'd per curiam, 368 U.S. 349, 82 S.Ct. 391, 7 L.Ed.2d 384 (1962).
 
 
 53
 Although the legal status of private contracts was unclear prior to 1978, BN overstates the case. The language describing private agreements as "unlawful per se" was merely dictum in a plurality decision. Guaranteed Rates from Sault Ste. Marie, Ontario to Chicago, supra, 315 ICC at 323. As the Commission has subsequently noted, this decision "is certainly not authoritative or in any way binding."[19] Ex Parte 358-F, Change of Policy, Railroad Contract Rates (General Policy Statement), 361 ICC 205, 208 (1979), citing Guaranteed Rates, supra, 315 ICC 311. The Commission further noted that Contract Rates on Rugs, one of the principal cases cited for the illegality of private contracts, encouraged ratemaking innovations such as contract rates so long as such rates comport with statutory standards. Contract Rates on Rugs & Carpeting from Amsterdam, N. Y. to Chicago, supra, 313 ICC 247.
 
 
 54
 We conclude that the BN-IPL agreement was not illegal per se and was properly given evidentiary value in the ICC's October 1, 1980 decision.[20] Ideal Cement Co. v. Atchison, T. & S. F. Ry. Co., 280 ICC 55 (1951); Sonken-Galamba Corp. v. Chicago, B. & Q. R.R., 172 ICC 233, 236 (1931); H. P. Hood & Sons v. Delaware & Hudson Co., 17 ICC 15, 18-19 (1909).
 
 
 55
 The Commission's approach to the parties' agreement here was particularly appropriate because it recognized the uncertain legal status of contracts entered into prior to 1978.[21] I & S 9199, supra, 364 ICC at 191-93, 197-98.
 
 
 56
 This is not to say that a rate agreement can control the Commission's determination of a just and reasonable rate. Lumber from and to Hampton & Branchville R. R., 264 ICC 419, 425 (1946); Shreveport Chamber of Commerce v. Gulf, C. & S. F. Ry., 201 ICC 73, 74 (1934); Holley Matthews Manufacturing Co. v. Yazoo & Mississippi Valley R. R., 15 ICC 436, 437 (1909). However, given the fact that no secret or preferential private agreement is involved here, the Commission's consideration of the agreement as evidence bearing on a reasonable rate was not erroneous as a matter of law.[22]
 
 C. The Parties' Intent to be Bound
 
 57
 Burlington Northern next argues that the Commission's enforcement of the agreed rate was erroneous because the parties had no intent to be bound by the rate negotiated in 1973. The parties' intentions present an issue of fact which we review under the substantial evidence standard. Burlington Northern, Inc. v. United States, supra, 555 F.2d 637.
 
 
 58
 The Commission carefully analyzed evidence of negotiations between the parties spanning the years 1973-1976. On the basis of their course of conduct, the Commission determined that both demonstrated the requisite intent to be bound. I & S 9199, supra, 364 ICC at 190-92. The Commission noted that BN actually sought permission to publish a rate of $5.23 (the contract rate); that Iowa Power concluded a formal contract with Amax Coal Company after agreeing to BN's proposed base rate; and that the presence of an annual escalation clause and gross inequity provision in the letter of understanding provided an orderly and agreed mechanism for resolution of unfairness. Id.
 
 
 59
 Against this substantial evidence, BN merely argues that the parties could not have intended to be bound because they knew that the Commission would view contract rates as unenforceable under the authority of such cases as Guaranteed Rates, supra, 315 ICC 311, and Contract Rates on Rugs, supra, 313 ICC 247.
 
 
 60
 We are unconvinced. Under existing case law, see Section B, supra, the parties in 1973 could reasonably have concluded that a contract rate would be considered important evidence as to the reasonableness of a proposed rate. Moreover, it is difficult to imagine why the parties took such pains to negotiate and agree upon terms if they could be unilaterally changed at any time. The railroad itself first attempted to rely upon the agreement it now seeks to repudiate when, in 1977, it stated that it would publish a higher rate due to the existence of a gross inequity within the meaning of the parties' agreement. I & S 9199, supra, 364 ICC at 191. In sum, there is substantial evidence to support the Commission's conclusion that the parties intended to be bound.
 
 
 61
 D. Statutory Ratemaking Standards (Revenue Adequacy)
 
 
 62
 Burlington Northern next contends that Section 205 of the 4-R Act of 1976 created a new "Rule of Ratemaking" which is violated by the agreed rate.[23] Under Section 205, the Commission is statutorily obliged to establish such rates as will allow a railroad to earn a reasonable profit or return, attract and retain capital, and support capital outlays. 49 U.S.C. § 10704(a) (2).[24] Burlington Northern challenges the Commission's cost of service calculations, arguing that its own calculations show the railroad will fail to recover fully allocated costs for the Council Bluffs movement. Moreover, even if the Commission's lower cost of service calculations are accepted, BN argues that the Commission-approved rate does not satisfy the statutory requirement of "revenue adequacy" set forth in 49 U.S.C. § 10704(a)(2).
 
 
 63
 We turn first to the allegation that the Commission miscalculated BN's cost of service. BN specifically objects to two adjustments in the Commission's statement of costs: the removal of the return on road property included in Rail Form A, and the deduction of deferred taxes from the net investment base prior to calculating the overall cost of capital.
 
 
 64
 This court has recently considered and approved these same cost adjustments as comporting with established Commission policy and appellate court precedent. Iowa Public Service Company v. ICC, 643 F. 2d 542, at 546-48 (8th Cir. 1981), citing San Antonio, Texas v. United States, 631 F.2d 831, 841-44, 846-47; Ex Parte No. 338, Standards and Procedures for the Establishment of Adequate Railroad Revenue Levels, 358 ICC 844, aff'd as modified, 359 ICC 270 (1978). Accordingly, and for the reasons set forth in the above-cited authority, we conclude that the ICC's cost restatement was not arbitrary, capricious or otherwise violative of the law.
 
 
 65
 We turn next to the argument that the agreed rate will not satisfy the revenue adequacy requirements of 49 U.S.C. § 10704(a)(2). The $5.62 agreed rate exceeds both total variable costs plus additives at the embedded debt level ($4.56) and total variable costs plus additives at the revenue need level ($4.58). The agreed rate also slightly exceeds restated fully allocated costs plus additives at the revenue need level ($5.53). I & S 9199, supra, 364 ICC at 209-10. In view of the fact that the agreed rate covers fully allocated costs at the revenue need level, it is difficult to perceive that the rate fails to meet the revenue adequacy requirement of the statute.[25]
 
 
 66
 Burlington Northern does not allege a violation of Section 202(b) of the 4-R Act, Pub.L.No.94-210, 90 Stat. 35 (1976), as recodified in substance by the Revised Interstate Commerce Act, Pub.L.No.95-473, 92 Stat. 1371 (1978), 49 U.S.C. § 10701(b)(1), which provides that a rate is not below the reasonable minimum rate if it contributes to a railroad's going concern value. See also Ex Parte No. 355, Cost Standards for Railroad Rates, 362 ICC 799, 800 (1980). Here, the Commission found that the agreed rate contributes to BN's going concern value. I & S 9199, supra, 364 ICC at 193.
 
 
 67
 The Commission has also soundly reasoned that enforcement of the agreed rate will in the long run be of value in helping BN attain adequate revenue levels. I & S 9199, supra, 364 ICC at 194. Enforcement of the agreed rate will encourage shippers to enter long-term contracts for shipments of significant volume. Negotiated ratemaking is a pricing innovation expressly recognized by the Commission as a possible key to revenue adequacy. Ex Parte No. 353, Adequacy of Railroad Revenue (1978 Determination), 362 ICC 198, 278, aff'd, 362 ICC 794 (1980).
 
 
 68
 E. Violation of the Administrative Procedure Act
 
 
 69
 Burlington Northern's final contention is that the Commission violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 706(2)(A), in promulgating and enforcing its 1980 policy statement, Ex Parte No. 358-F, Change in Policy Railroad Contract Rates (decided February 21, 1980). In this statement, the ICC indicated that it would consider enforcement of contracts executed before 1978 on a case-by-case basis. See n.18, supra.
 
 
 70
 Burlington Northern argues that the 1980 policy statement was a rulemaking requiring notice and comment procedures pursuant to 5 U.S.C. § 553(b), rather than a policy statement exempt from such procedures under 5 U.S.C. § 553(b) (A). The railroad also contends that the ICC acted arbitrarily and capriciously in applying the 1980 policy to prior conduct, in violation of 5 U.S.C. § 706(2) (A).
 
 
 71
 A policy statement is not defined in the APA but has been characterized through case-by-case development.[26] Such a statement does not establish a "binding norm," but instead announces the agency's tentative intentions for the future. Brown Express, Inc. v. United States, 607 F.2d 695, 701 (5th Cir. 1979); Pacific Gas & Electric Co. v. FPC, 506 F.2d 33, 38-39 (D.C.Cir. 1974), and is marked by the absence of substantial impact on existing rights and obligations. Lewis-Mota v. Secretary of Labor, 469 F.2d 478, 482 (2d Cir. 1972). The Attorney General's Manual further defines statements of policy as those issued "to advise the public prospectively of the manner in which the agency proposed to exercise a discretionary power." Attorney General's Manual on the Administrative Procedure Act 30 n.43 (1947). The courts have similarly required that a policy statement leave the administrator free to exercise his informed discretion. Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp., 589 F.2d 658, 666 (D.C.Cir.1978). See also 3 B. Mezines, J. Stein & J. Gruff, Administrative Law § 15.05(4) at 15-81 (1981).
 
 
 72
 We conclude that the ICC's 1980 policy statement satisfies these requirements. The statement advised the public prospectively how the Commission would view pre-1978 contracts in assessing the reasonableness of a rate. The statement in no way established a binding norm for future rate cases, but instead left the Commission free to exercise considerable discretion in considering whether, and to what extent, to enforce contracts executed prior to 1978. Ex Parte No. 358-F, supra, Change of Policy Railroad Contract Rates (decided February 21, 1980), 45 Fed.Reg. at 21720.
 
 
 73
 We also conclude that the ICC did not act arbitrarily or capriciously in applying its new policy on contract rates to past conduct. Retroactive application of policy is disfavored when the ill effects of such application will outweigh the need of immediate application, NLRB v. Majestic Weaving Co., 355 F.2d 854, 861 (2d Cir. 1966), or when the hardship on affected parties will outweigh the public ends to be accomplished. SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).
 
 
 74
 In this case, the Commission closely scrutinized the potential harm to BN that might result from enforcement of the agreed rate, finding not only that the rate would exceed BN's fully allocated costs of service, but also that public interest considerations strongly warrant holding these parties to their agreement. Applying the February, 1980 policy in this case will give BN the benefit of an agreement into which it freely entered. This is a "burden" only in comparison with the higher rate it seeks to obtain. Accordingly, it was reasonable for the Commission to conclude that the benefits from application of the February, 1980 policy clearly outweighed any adverse effects.[27]
 
 
 75
 F. Consolidated Appeal of Denial of Injunctive Relief
 
 
 76
 On the court's own motion, Cause No. 79-1676 has been consolidated with BN's present petition for review. This cause involves Iowa Power's attempt to secure injunctive relief against BN's attempted breach of the parties' rate agreement.
 
 
 77
 In a decision filed February 12, 1980, a divided panel of this court ruled that the court could, by means of injunction, prevent BN from breaching its agreement with Iowa Power. Iowa Power and Light Co. v. Burlington Northern, Inc., No. 79-1676 (Feb. 12, 1980). On March 21, 1980, however, the court granted the railroad's petition for rehearing in that case.
 
 
 78
 While the petition for rehearing was pending, the Commission sought and received a remand of its July, 1979 decisions, thereby obtaining an opportunity to reconsider its refusal to enforce the agreed rate. Ultimately, the Commission on October 1, 1980 ordered BN to file within thirty-five days a rate consistent with the parties' agreement.
 
 
 79
 In view of the remand to the Commission and the ICC's October 1, 1980 decision enforcing the agreed rate, we have no reason to expect that injunctive relief is necessary to prevent BN's breach of contract. Interim events have completely eradicated the effect of the anticipated violation. Where these conditions are met, it is appropriate that we dismiss the case involving injunctive relief as moot. County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); Great Western Sugar Co. v. Nelson, 442 U.S. 92, 99 S.Ct. 2149, 60 L.Ed.2d 735 (1979) (per curiam); United States v. Munsingwear, Inc., 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950). Accordingly, we vacate the judgment of the district court denying injunctive relief, dismiss Cause No. 79-1676 as moot, and remand the cause to the District Court for the Southern District of Iowa for entry of an order dismissing the action as moot.[28]
 
 
 80
 Iowa Power's petitions for review in Causes 80-1914 and 80-1915 have been withdrawn with the court's permission. Burlington Northern's petition for review in Cause No. 80-1959 is denied.
 
 
 
 [1]
 This petition for review encompasses I & S 9199, Unit Train Rates on Coal Burlington Northern, Inc., 364 ICC 186 (1980); No. 36944, Iowa Power and Light Co. v. Burlington Northern, Inc.; No. 37322, Coal Belle Ayr and Eagle Junction, Wy. to Council Bluffs, Ia.; No. 37354, Iowa Power and Light Co. v. Burlington Northern, Inc
 
 
 [2]
 For convenience, we refer hereinafter to the "contract rate" or "agreed rate," recognizing that the effective rate under the parties' agreement continues to rise in accordance with an escalation formula which is part of the agreement
 
 
 [3]
 To allow shipments of coal to commence to move, Burlington Northern published the agreed rate of $5.23 on an interim basis. Pursuant to Freight Tariff 280, ICC No. 496 (subsequently renumbered ICC BN 4184), the $5.23 rate became effective February 1, 1978, and carried a cancellation date of June 30, 1978, which was the contemplated effective date of the capital incentive rate
 
 
 [4]
 Section 10707 is derived from Section 15(8) of the Interstate Commerce Act, 49 U.S.C. § 15(8) (1976), as amended by the Local Rail Service Assistance Act of 1978, Pub.L.No. 95-607, Title VI, § 401, 92 Stat. 3067. The section was recodified pursuant to the Revised Interstate Commerce Act, Pub.L.No. 95-473, 92 Stat. 1380 (1978). For convenience we refer to the section as contained in the West Annotation (Supp.1980)
 
 
 [5]
 IPL petitioned for review of the July 6, 1979 decision in the Eighth Circuit. BN petitioned for review of the July 6 and July 13, 1979 decisions in the United States Court of Appeals for the D. C. Circuit. The D. C. Circuit transferred those appeals to this court on August 30, 1979
 
 
 [6]
 Iowa Power subsequently moved for and was granted permission to withdraw its petition for review
 
 
 [7]
 Ordinarily, we would be compelled to remand this proceeding to the ICC, deferring to the agency for a decision in the first instance on the jurisdictional question. However, as a statutory party to this review, the Commission has had an opportunity to present its position on the Staggers Rail Act. Relying on Section 208 of the Act, the Commission contends that the jurisdictional threshold of Section 202 does not apply. Therefore, the Commission concludes, the ICC had jurisdiction to issue its October 1, 1980 decision. We reach the same result by a different route. Cf. FPC v. Louisiana Power & Light Co., 406 U.S. 621, 647, 92 S.Ct. 1827, 1841, 32 L.Ed.2d 369 (1972) (Court of Appeals is obliged to defer to agency for determination of primary jurisdiction when the issue is pending in proceeding before the agency); Marine Engineers Beneficial Ass'n v. Interlake Steamship Co., 370 U.S. 173, 185, 82 S.Ct. 1237, 1243, 8 L.Ed.2d 418 (1962) (need for protecting agency's exclusive jurisdiction is greatest when issue before the court is in the process of litigation through procedures originating in the agency)
 
 
 [8]
 The Staggers Rail Act of 1980 was signed into law on October 14, 1980. Section 710 of the Act provides that all provisions relevant here became effective as of October 1, 1980. Pub.L.No. 96-448, 94 Stat. 1966 (1980)
 
 
 [9]
 The argument that the Commission lacked jurisdiction would seem to apply as well to the Commission's orders of July, 1979. All of these orders were entered on or before the effective date of the Staggers Rail Act. Thus, the same jurisdictional question pertains to each order, namely whether the Staggers Rail Act necessitates a retroactive determination of ICC jurisdiction in the context of a final Commission decision
 
 
 [10]
 The Commission found that restated variable costs plus additives at the revenue need level were $4.58 per ton. 364 ICC at 210 1.24b. The agreement rate ordered by the Commission is $5.62 per ton. BN calculates the revenue-to-cost percentage by dividing $5.62 by $4.58, i. e., $5.62 / $4.58 $ 1.227
 Because we find that the revenue-to-cost percentage specified in the Staggers Rail Act does not apply in this case to determine jurisdiction, it is unnecessary to decide whether additives should be included in the calculation of the revenue-to-variable-cost ratio. See Central Power and Light Co. v. United States, 634 F.2d 137 (5th Cir. 1980), petition for rehearing granted Feb. 26, 1981. See also the Staggers Rail Act, § 202, to be codified at 49 U.S.C. § 10709(d)(1)(A) (providing that for purposes of market dominance, the return on equity capital is limited to a rate equal to the embedded cost of debt).
 
 
 [11]
 Given this conclusion, we do not reach the questions (1) whether Section 208 of the Staggers Rail Act should be read as a jurisdictional provision; (2) whether Section 208 creates a "contract" exception to the jurisdictional thresholds of Section 202; (3) whether contract rights preserved by subsection (j) of Section 208 are enforceable by the Commission or the courts
 These are difficult issues, answered only in part by pertinent legislative history. See 120 Cong.Rec. H8606 (daily ed. Sept. 9, 1980) (remarks of Rep. Dingell); 126 Cong.Rec. H10085-86 (daily ed. Sept. 30, 1980) (remarks of Rep. Dingell). See also ICC Interpretive Statement Contract Rates, decided November 5, 1980 (unpublished).
 
 
 [12]
 The Senate Bill, S. 1946, 96th Cong., 2d Sess. (1980), contained no provision for the effect of the Staggers Rail Act on pending matters. House Conf.Rep.No.96-1430, 96th Cong., 2d Sess. at 142 (1980), reprinted in (1980) U.S.Code Cong. & Ad.News at 7574
 The House Bill, H.R.No.7235, 96th Cong., 2d Sess. (1980), contained a provision stating that all applications or proceedings pending before the Commission or other agencies, or any court, should be determined as if the law had not been enacted. House Conf.Rep.No.96-1430, 96th Cong., 2d Sess. at 142, reprinted in (1980) U.S.Code Cong. & Ad.News at 7574.
 The House and Senate Conference Committee deleted the House provision and substituted Section 706 of the Staggers Rail Act, which addresses the effect of the Act on existing rate bureau proceedings. The final version of the Act does not address other pending proceedings, but this omission "is not intended to create any implication" that pending proceedings
 are not to be adjudicated or determined under existing law or the new legislation in accordance with controlling case law. The deletion of these provisions means that existing cases at the Commission, other affected agencies, or pending in the Federal courts, shall be determined as present case law requires that they be determined.
 House Conf.Rep.No.96-1430, 96th Cong., 2d Sess. at 142, reprinted in (1980) U.S.Code Cong. & Ad.News at 7574 (emphasis added).
 Since the present proceeding is not a rate bureau proceeding, the legislative history of the Staggers Rail Act clearly refers us to case law in determining the effect of the legislation on pending cases.
 
 
 [13]
 This principle conflicts with the rule of statutory interpretation favoring prospective application of new law. The conflict between these principles has not often been acknowledged, let alone resolved, Hill v. United States, 571 F.2d 1098, 1102 (9th Cir. 1978); Bradley v. School Board of Richmond, 472 F.2d 318, 335 (4th Cir. 1972) (en banc) (Winter, J., dissenting), vacated, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), although a helpful discussion is contained in Sikora v. American Can Co., 622 F.2d 1116, 1125-35 (3d Cir. 1980) (Adams, J., dissenting)
 We find it unnecessary to resolve the conflict between the two lines of decision because we reach the same result under the concept of presumed prospectivity and under the "manifest injustice" exception to the rule applying new law to pending cases.
 
 
 [14]
 We recognize the difficulty in defining a "matured" or "vested" right for purposes of the manifest injustice exception. The argument can be made that rights become sufficiently vested to invoke the exception when there exists a final administrative decision, even though, as here, the administrative decision may become the subject of subsequent judicial appeals. Cf. Greene v. United States, supra, 376 U.S. at 160-61, 84 S.Ct. at 621-622 (by virtue of district court order, petitioner obtained a final and favorable determination)
 On the other hand, there is considerable authority for the proposition that an appeal is not a new suit but a proceeding in the original cause, and, as such, a bar to the investiture of rights. Rodulfa v. United States, 461 F.2d 1240, 1252-53 & 1253 nn.64-70 (D.C.Cir.), cert. denied, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972) (and citations therein). Cf. South East Chicago Comm'n v. Dept. of Housing and Urban Development, 488 F.2d 1119, 1125 n.6 (7th Cir. 1973) (first and basic question is what can be regarded as prospective and what must fairly be regarded as vested), citing Jones v. Lynn, 477 F.2d 885, 889 (1st Cir. 1973).
 In the present case, we do not decide that the manifest injustice exception applies solely on the basis of existing antecedent rights, although we conclude that Iowa Power's rights under the Commission's October 1, 1980 decision are sufficient to invoke the exception. In the context of the exception, the Supreme Court has spoken not merely of infringement upon definitive rights, but also of lesser "imposition(s)." Thorpe v. Housing Authority of Durham, supra, 393 U.S. at 283, 89 S.Ct. at 526 (new law applies to pending proceedings where there is no infringement of existing rights and no lesser imposition).
 
 
 [15]
 There is room for uncertainty as to whether the Council Bluffs rate falls below or above the jurisdictional threshold of a revenue-to-variable-cost ratio of 160 percent. The rate sought by BN ($7.38 per net ton) would result in a ratio of 162 percent. The rate ordered by the Commission in its July, 1979 decisions ($7.25 per net ton) would result in a ratio of 159 percent, while the agreed rate ($5.62 per net ton) would result in a ratio of 123 percent
 
 
 [16]
 We intend no finding on the issue of the appropriate forum for enforcement of contracts entered into prior to the effective date of the Staggers Rail Act. The Act provides an exclusive remedy for breach of contract in the courts, but the ICC has taken the position that pre-Staggers Act contracts are enforceable by the Commission. See Staggers Rail Act of 1980, § 208, Pub.L.No. 96-448, 94 Stat. 1909 (1980), to be codified at 49 U.S.C. § 10713(i)(2); ICC Interpretive Statement Contract Rates, served November 10, 1980 (unpublished)
 
 
 [17]
 A more difficult situation was presented under the Commission's July 13, 1979 decision. I & S 9199, supra, 361 ICC 655. In this decision, the Commission approved $7.25 as a reasonable maximum rate, creating a situation of clear inconsistency between the Commission's approved rate and the parties' agreed rate. The July, 1979 decision was vacated by the Commission to the extent that it is inconsistent with the October 1, 1980 decision. 364 ICC at 200
 We consider separately the July, 1979 decision and an appeal involving equitable relief from this decision in Section F, infra.
 
 
 [18]
 Pursuant to notice of intent to change its policy regarding contract rates, the Commission in November, 1978 issued a general policy statement expressly approving contract rates as not unlawful, and as beneficial in many situations. Ex Parte No. 358-F, Change of Policy Railroad Contract Rates (served November 9, 1978), aff'd 361 ICC 205 (1971); modified in Special Permission No. 79-3700, Railroad Contract Rates (decided October 9, 1979)
 In February, 1980 the Commission addressed the question whether the 1978 contract policy would apply to contracts executed prior to November 9, 1978. Ex Parte 358-F, Change of Policy Railroad Contract Rates (decided February 21, 1980), 45 Fed.Reg. 21719 (1980). The Commission concluded that it would consider whether, or to what extent, to enforce such pre-Ex Parte 358-F contracts on a case by case basis.
 For convenience, we refer hereinafter to the Commission's November 9, 1978 general policy statement as "the November, 1978 policy statement." The Commission's February 21, 1980 statement on pre-1978 contracts is referred to as "the February, 1980 statement."
 
 
 [19]
 Cf. United States v. Pink, 315 U.S. 203, 216, 62 S.Ct. 552, 558, 86 L.Ed. 796 (1942) (affirmance by an equally divided court was binding on the parties but "the lack of agreement by a majority of the Court on the principles of law involved prevents it from being an authoritative determination for other cases")
 
 
 [20]
 While the Commission gave weight to the parties' agreement, the Commission's October 1, 1980 decision enforcing the agreed rate was not based on contract law. The Commission considered the parties' agreement and other factors in assessing the $5.62 rate under the statutory standard of reasonableness
 We similarly do not reach issues of contract law. As to BN's contention that no contract was formed, we note without deciding that BN's 1973 rate offer was arguably made irrevocable by IPL's substantial reliance on it. Restatement (Second) of Contracts § 90 (Tent. Draft 1973); Henderson, Promissory Estoppel and Traditional Contract Doctrine, 78 Yale L.J. 343 (1969). Iowa Power expended over $8 million for railcars and $1.3 million for spur track improvements after a rate agreement was struck. I & S 9199, supra, 364 ICC at 192.
 
 
 [21]
 Under the Commission's approach, as applied in this and other cases, contracts entered into after the Commission's November 9, 1978 policy statement create a presumption that an above-contract rate is unreasonable. Agreements entered into prior to the 1978 policy statement are considered on a case-by-case basis. Such contracts are given great weight only where, as here, the Commission is convinced (1) that the parties intended to be legally bound by the agreement; (2) that the shipper reasonably relied on the contract to its substantial detriment; (3) that public interest considerations warrant holding the carrier to the agreement. Ex Parte No. 358-F, Change of Policy Railroad Contract Rates (decided February 21, 1980), 45 Fed.Reg. 21719 (1980)
 BN argues as a separate point that Iowa Power has not made the first showing above, that the parties intended to be bound. We consider this contention separately. See Section C, infra.
 
 
 [22]
 In concluding that the parties' agreement was properly given weight by the Commission under pre-Staggers Act decisional law, we do not decide whether subsection (j) of Section 208 of the Staggers Rail Act provides an alternate basis for enforcement of the agreed rate
 Subsection (j) of Section 208, Pub.L.No.96-448, 94 Stat. 1909 (1980), to be codified at 49 U.S.C. § 10713(j), provides that a lawful contract in effect on the effective date of the Staggers Rail Act shall have the same force and effect as if it had been entered in accordance with the provisions of Section 208. Iowa Power contended in oral argument that Congress by means of this subsection has ratified and endorsed the ICC's 1978 and 1980 policy statements approving contract rates. Subsection (j) is said by Iowa Power to "grandfather in" contracts which might have been considered illegal under pre-Staggers Act case law. We express no opinion on this contention.
 
 
 [23]
 Section 205 of the 4-R Act, Pub.L.No.94-210, 90 Stat. 41 (1976), amended Section 15a(4) of the Interstate Commerce Act, 49 U.S.C. § 15a(4) (1976). As recodified pursuant to the Revised Interstate Commerce Act, Pub.L.No.95-473, 92 Stat. 1374 (1978), the provisions of Section 15a(4) are found at 49 U.S.C. § 10704, cited here for convenience to the West Annotation (Supp.1980)
 
 
 [24]
 49 U.S.C. § 10704(a)(2) provides in pertinent part:
 The Commission shall maintain standards and procedures for establishing revenue levels that are adequate to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business. The Commission shall make an adequate and continuing effort to assist those carriers in attaining revenue levels prescribed under this paragraph .... Revenue levels established under this paragraph should
 (A) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation; and
 (B) attract and retain capital in amounts adequate to provide a sound transportation system in the United States.
 
 
 [25]
 The Commission has interpreted "revenue adequacy" within the meaning of 49 U.S.C. § 10704(a)(2) to encompass a range of figures adequate to provide a fair rate of return on investment and a sufficient flow of funds. Ex Parte 353, Adequacy of Railroad Revenue (1978 Determination), 362 ICC 198, 222-24, 246 (1980), aff'd, 362 ICC 794 (1980)
 The Commission's restatement of costs at the revenue need level addresses this construction of revenue adequacy. Here, the ICC's restated costs at the revenue need level included provision for a rate of return (cost of capital including both debt and equity) of 10.6 percent adjusted to 9.9 percent to take into account deferred income taxes. I & S 9199, supra, 364 ICC at 205-06. The Commission's methodology in computing the cost of capital comports with procedures developed by ICC rulemaking. Ex Parte No. 338, Standards and Procedures for the Establishment of Adequate Railroad Revenue Levels, 358 ICC 844 (1978), 49 C.F.R. § 1109.25 (1978).
 
 
 [26]
 A "rule" is defined by the Administrative Procedure Act to mean in pertinent part
 the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates.
 5 U.S.C. § 551(4).
 
 
 [27]
 BN raises the final point that the Commission's October 1, 1980 decision was not timely because 49 U.S.C. § 10327(g)(2)(B) required a decision within 120 days from the date reconsideration was granted. The time period began to run on May 7, 1980, the date this court remanded the case to the ICC. On September 4, 1980, the ICC pursuant to 49 U.S.C. § 10327(j) properly extended the date for its decision to October 3, 1980. The Commission's decision, decided September 29, 1980 and served October 1, 1980, was clearly timely
 
 
 [28]
 Of necessity, our decision vacating the judgment of the district court deprives that court's opinion of precedential effect. County of Los Angeles v. Davis, supra, 440 U.S. at 634 n.6, 99 S.Ct. at 1384 n.6