846 F.2d 1422
 269 U.S.App.D.C. 436, 1988-1 Trade Cases 68,007
 UNITED STATES of America
v.
WESTERN ELECTRIC CO., INC., et al.
Pacific Telesis Group, Appellant,
American Information Technologies Corp., New York Telephone
Co., et al. Intervenors.
UNITED STATES of America
v.
WESTERN ELECTRIC CO., INC., et al.
US West, Inc., Appellant,
American Information Technologies Corp., New York Telephone
Co., et al. MCI Communications Corporation, Intervenors.
UNITED STATES of America
v.
WESTERN ELECTRIC CO., INC., et al.
Bell Atlantic, Appellant.
 Nos. 87-5063, 87-5064 and 87-5110.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 19, 1988.
Decided May 10, 1988.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 82-00192).
 James vanR. Springer, with whom David I. Shapiro, Washington, D.C., was on the brief, for appellant U.S. West, Inc. Robert B. McKenna, Washington, D.C., also entered an appearance, for appellant U.S. West in 87-5064.
 Robert V.R. Dalenberg, with whom Marion J. Stanton and Randall E. Cape, San Francisco, Cal., were on the brief, for appellant Pacific Telesis Group. Paul H. White, Margaret deB. Brown and Stanley J. Moore, San Francisco, Cal., also entered appearances, for appellant Pacific Telesis Group in 87-5063.
 James R. Young, with whom Robert A. Levetown, John M. Goodman, James G. Pachulski and Mark J. Mathis, Washington, D.C., were on the brief, for appellant Bell Atlantic.
 Robert J. Wiggers, U.S. Dept. of Justice, with whom Deborah A. Garza, Counselor to the Asst. Atty. Gen., Barry Grossman, Robert B. Nicholson and Nancy C. Garrison, U.S. Dept. of Justice, Washington, D.C., were on the brief, for appellee U.S. of America.
 David W. Carpenter, Chicago, Ill., with whom Francine J. Berry, Mark C. Rosenblum, New York City, and Howard J. Trienens, Chicago, Ill., were on the brief, for appellee American Tel. and Tel. Co. Jonathan S. Hoak and Robert D. McLean, Chicago, Ill., also entered appearances for appellee American Tel. and Tel. Co. in 87-5063, 87-5064 and 87-5110.
 Alfred Winchell Whittaker, Washington, D.C., with whom John Thorne was on the brief, for intervenor Ameritech.
 Chester T. Kamin, Chicago, Ill., Michael H. Salsbury, Thomas S. Martin, Anthony C. Epstein and Carl S. Nadler, Washington, D.C., were on the brief, for intervenor MCI Communications Corp.
 Saul Fisher, Bedminster, N.J., and Martin J. Silverman, Washington, D.C., were on the brief for intervenor NYNEX Telephone Companies.
 Before MIKVA, EDWARDS and STARR, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 Dissenting opinion filed by Circuit Judge STARR.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 On October 29, 1986, the General Services Administration ("GSA") issued a request for bids to provide fourteen switches that are part of the Government's private telephone network, the Federal Telecommunications System ("FTS"). These switches are used to transfer calls originating in Government offices to long-distance lines leased from an interexchange carrier, as well as to transfer calls carried on long-distance lines to their destination, whether they terminate in another Government office or at some location outside the FTS network. On November 6, 1986, American Telephone and Telegraph Company ("AT & T") filed an Emergency Motion with the District Court, seeking an order enjoining US West, Inc.,[1] from offering GSA access to local exchange facilities for completing calls off the FTS network at a lower price than it charged AT & T and other interexchange carriers for local exchange access, provided that GSA purchased its switching services from US West rather than from AT & T or another interexchange carrier. AT & T also asked the court to enjoin US West from offering GSA trunk lines from the facility servicing a Government office building to the FTS network switch at no charge if GSA chose to have US West provide the switch, while requiring GSA to pay for such lines if an interexchange carrier supplied the switch. AT & T argued that US West had used both of the pricing practices it sought to have enjoined when US West successfully bid for contracts to provide four other FTS switches, that US West was likely to repeat these practices when responding to GSA's new bid request, and that both pricing practices violated section II(B) and Appendix B, section B(1), of the Modification of Final Judgment ("MFJ") which ended the Government's antitrust suit against AT & T.[2] The District Court granted AT & T's Emergency Motion. United States v. Western Elec. Co., Civ. No. 82-0192 (D.D.C. Nov. 26, 1986), reprinted in Joint Appendix ("J.A.") 18. US West has appealed.
 
 
 2
 On December 23, 1986, Bell Atlantic moved for an order clarifying the District Court's Order of November 26, 1986, and for a stay with respect to further application of the Order to services Bell Atlantic was currently providing, until Bell Atlantic was able to obtain a ruling from the Federal Communications Commission ("FCC") on the appropriate access charges for its services. The District Court denied Bell Atlantic's motion for clarification, because it deemed the legal principles enunciated in its earlier Order "clear" and "not fact-specific," so that "there [was] ... no basis for distinguishing between US West and Bell Atlantic." United States v. Western Elec. Co., Civ. No. 82-0192 (D.D.C. Mar. 31, 1987), reprinted in J.A. 29, 30. The court also denied Bell Atlantic's motion for a stay, because it found that its earlier Order would not compel the Regional Holding Companies to act contrary to state or federal regulations. Bell Atlantic has appealed.
 
 
 3
 We affirm the District Court's Order of November 26, 1986. We agree that the MFJ's nondiscrimination provisions prohibit a Regional Holding Company or a BOC from offering GSA local exchange access or trunk lines connecting GSA telecommunications facilities to FTS switches at lower rates than it charges interexchange carriers. We also affirm the District Court's Order of March 31, 1987, denying Bell Atlantic's motion for clarification and a stay. In doing so, however, we do not embrace statements made by the court in denying clarification that might suggest that it was resolving matters not before it in the former proceeding.
 
 I. BACKGROUND
 
 4
 A. US West's Provision of FTS Switches to GSA
 
 
 5
 In June 1985, GSA requested bids to supply FTS switches in Denver, Albuquerque, Salt Lake City, and Phoenix. At the time, switching services were provided by AT & T Common Control Switching Arrangements ("CCSAs") in those four cities. GSA accepted US West's proposal over AT & T's offer because it promised savings of between $77,000 and $150,000 per month.
 
 
 6
 AT & T alleges that US West was able to undercut AT & T's offer at least partly because US West engaged in two discriminatory pricing practices that violated the MFJ.[3] AT & T first charges that US West offended the MFJ by offering GSA access to local, public exchange networks, if GSA chose to have US West supply the FTS switches for those cities, at a lower price than AT & T would have to pay (and then bill GSA) if GSA purchased switching services from AT & T. If AT & T supplied the FTS switch, then there is no question that AT & T would be required to pay, pursuant to FCC regulations, the Feature Group A tariffs that apply to interexchange calls that leave the FTS network and terminate within the local exchange network. These tariffs are high, because, since divestiture, the FCC, by means of such access charges, has compelled interexchange service users to pay more than the cost of that service and thus to subsidize local telephone service users.
 
 
 7
 Second, AT & T claims that US West offered to provide GSA with Dial 8 lines connecting the Centrex serving a Government office to the local FTS switch free of charge if GSA had US West provide the switch. In contrast, if GSA decided to have AT & T supply the FTS switch, AT & T would have to obtain Dial 8 lines under applicable access tariffs (or pay simulated access charges for facilities leased under Shared Network Facilities Agreements) at a substantial monthly charge. That charge would have to be passed on to GSA if GSA purchased AT & T's switching services. AT & T contends that US West's offer constituted illicit price discrimination under the MFJ.
 
 B. Legal Proceedings
 
 8
 On October 29, 1986, GSA solicited bids for contracts to provide fourteen FTS switches. Two of the switches were in cities served by US West. On November 6, 1986, AT & T filed an Emergency Motion with the District Court. AT & T sought an order enjoining US West, under the terms of the MFJ, from engaging in the two forms of alleged price discrimination it used in securing contracts for four FTS switches in Denver, Albuquerque, Salt Lake City, and Phoenix. Specifically, AT & T proposed that US West be ordered:
 
 
 9
 (1) to provide access and other local exchange facilities for the Federal Telecommunications System network and other private networks at the same rates, regardless of which carrier a customer selects to provide switching functions, and (2) publicly to announce the access and other local charges that will be the basis for any US West responses to the General Services Administration's pending requests for proposals to replace switching systems on the FTS network at least 15 days before the submission of those responses.
 
 
 10
 Proposed Order, reprinted in J.A. 35. US West and five other Regional Holding Companies (which were not parties to the suit) filed opposing responses.
 
 
 11
 On November 26, 1986, the District Court granted AT & T's Emergency Motion and adopted its Proposed Order. United States v. Western Elec. Co., Civ. No. 82-0192 (D.D.C. Nov. 26, 1986), J.A. 18. The trial court enjoined US West from offering Dial 8 lines or local exchange access to GSA at lower rates than it charged AT & T. The District Court found that both forms of price discrimination contravened two complementary provisions of the MFJ.
 
 
 12
 Section II of the MFJ, entitled "BOC Requirements," reads in relevant part:
 
 
 13
 A. Subject to Appendix B, each BOC shall provide to all interexchange carriers and information service providers exchange access, information access, and exchange services for such access on an unbundled, tariffed basis, that is equal in type, quality, and price to that provided to AT & T and its affiliates.
 
 
 14
 B. No BOC shall discriminate between AT & T and its affiliates and their products and services and other persons and their products and services in the:
 
 
 15
 * * *
 
 
 16
 3. interconnection and use of the BOC's telecommunications service and facilities or in the charges for each element of service.
 
 
 17
 United States v. AT & T, 552 F.Supp. at 227 (reprinting MFJ). The pertinent section of Appendix B, which is entitled "Phased-In BOC Provision of Equal Exchange Access," reads as follows:
 
 
 18
 B.1. The BOCs are ordered and directed to file, to become effective on the effective date of the reorganization described in paragraph I(A)(4), tariffs for the provision of exchange access including the provision by each BOC of exchange access for AT & T's interexchange telecommunications. Such tariffs shall provide unbundled schedules of charges for exchange access and shall not discriminate against any carrier or other customer. Such tariffs shall replace the division of revenues process used to allocate revenues to a BOC for exchange access provided for the interexchange telecommunications of BOCs or AT & T.
 
 
 19
 Id. at 233 (reprinting MFJ).
 
 
 20
 The District Court held that charging different rates for exchange access and Dial 8 lines to AT & T and GSA constitutes discrimination "between AT & T and ... other persons" under section II(B) and discrimination "against any carrier or other customer" under section B(1) of Appendix B. The court also noted that compliance with its ruling would almost certainly not cause US West to run afoul of state or federal regulations. If a conflict did arise, the court said, then US West should seek to resolve the conflict in favor of the MFJ; if that were impossible, then further guidance should be sought from the court. Slip op. at 8 & n. 8, J.A. 25.
 
 
 21
 On December 23, 1986, Bell Atlantic moved for clarification of the Order granting AT & T's Emergency Motion as it might apply to Bell Atlantic. It also requested a stay of the Order as it applied to services Bell Atlantic then provided, until Bell Atlantic obtained a ruling from the FCC regarding the proper local access charges for its services. The District Court denied Bell Atlantic's motion on March 31, 1987. United States v. Western Elec. Co., Civ. No. 82-0192 (D.D.C. Mar. 31, 1987), J.A. 29. The court found its earlier Order sufficiently clear and saw no need for a stay in view of Bell Atlantic's inability to demonstrate a "collision" between the court's Order and state or federal regulatory schemes, particularly in light of Bell Atlantic's admission that it would comply with the Order. Id., slip op. at 2, J.A. 30.
 
 
 22
 US West and Bell Atlantic filed timely appeals with this court. On December 18, 1987, the FCC issued its provisional response to a request by Bell Atlantic for clarification of the applicability of federal and state access tariffs to FTS switching services provided by the Electronic Tandem Switch ("ETS") of a Regional Holding Company. Bell Atlantic Petition, 2 F.C.C. Rcd. 7458 (1987). The FCC tentatively ruled that Regional Holding Companies providing FTS switching must, under FCC regulations, pay the same local access charges that AT & T is required to pay when it provides FTS switching. Hence, the FCC's provisional ruling was in accord with the District Court's decision concerning access charges, although it was grounded in an interpretation of its own regulations rather than the MFJ.
 
 II. ANALYSIS
 A. The Applicability of the MFJ
 
 23
 This court has held that the "construction of a consent decree is essentially a matter of contract law," Citizens for a Better Environment v. Gorsuch, 718 F.2d 1117, 1125 (D.C. Cir.1983), cert. denied, 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984), and that this principle applies to judicial interpretations of the MFJ. United States v. Western Elec. Co., 797 F.2d 1082, 1089 (D.C. Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). Hence, the District Court's reading of the MFJ is subject to de novo review. Id. at 1089.
 
 
 24
 In United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), the Supreme Court stated that "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." In ascertaining the MFJ's scope, however, "reliance upon certain aids to construction is proper, as with any other contract," including "the circumstances surrounding the formation of the consent decree." United States v. ITT Continental Baking Co., 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). Our interpretation of the MFJ must therefore be grounded in the text of the agreement and contemporaneous understandings of its purposes, not in our own conception of wise policy.
 
 
 25
 The District Court relied upon both of these legitimate sources in reaching its decision. In the court's view, section B(1) of Appendix B and section II(B)(3) of the MFJ "condemn on their face as illegal under the decree discriminatory pricing schemes" of the sort AT & T alleged that US West was likely to employ. United States v. Western Elec. Co., Civ. No. 82-0192, slip op. at 4-5 (D.D.C. Nov. 26, 1986), J.A. 21-22. In addition, the court said, the acknowledged aims of the MFJ would not be served by allowing a BOC or a Regional Holding Company to discriminate against AT & T:
 
 
 26
 [The MFJ] was not intended to prevent only discrimination in favor of AT & T or among interexchange carriers, while permitting discrimination against AT & T. This assertion was rejected several years ago, see United States v. Western Electric Co., 583 F.Supp. 1257, 1259 n. 10 (D.D.C. 1984), and it is entirely inconsistent with the basic scheme of the decree that the competitive telecommunications markets were to operate on the basis of level playing fields.
 
 
 27
 Id., slip op. at 5 n. 5, J.A. 22.
 
 
 28
 We agree with the District Court that the MFJ applies to the charging of different rates by a BOC or a Regional Holding Company for local exchange access or Dial 8 lines, depending upon whether a purchaser such as GSA buys its switching services from the BOC or Regional Holding Company rather than from AT & T or some other interexchange carrier. Although relevant sections of the MFJ are not entirely free from ambiguity, we find the District Court's reading of them to be eminently reasonable. The court's reading, moreover, comports better with the purposes of the MFJ, as evidenced by its text and by contemporaneous statements of its objectives.
 
 
 29
 Section II(B)(3) of the MFJ proscribes discrimination by a BOC[4] "between AT & T ... and other persons ... in the interconnection and use of the BOC's telecommunications service and facilities or in the charges for each element of service." The term "other persons" is extremely broad. Certainly it is sufficiently elastic to encompass GSA. Nor is there reason to read limitations into the term that the MFJ's drafters did not supply. Although section II(A) requires the BOCs to provide "to all interexchange carriers and information service providers" exchange access and exchange services of the same sort that they provide to AT & T, there is no indication, either in the text of the MFJ or in statements made in connection with its composition, that "other persons," as that term is used in section II(B), was meant to serve merely as a proxy for "all interexchange carriers and information service providers." Indeed, the natural inference from the use of the broader term "other persons" is that the parties to the MFJ meant it to bear wider signification; else they would simply have repeated section II(A)'s more qualified reference to "interexchange carriers and information service providers."
 
 
 30
 The District Court's construction of the term "other persons" is bolstered by section B(1) of Appendix B, as well as by the fact that section II(A), which contains the narrower reference to "interexchange carriers and information service providers," was expressly made "[s]ubject to Appendix B." Appendix B, section B(1), provides that BOC tariffs for the provision of exchange access "shall not discriminate against any carrier or other customer." The phrase "any carrier or other customer" appears at least as capacious as section II(B)' § reference to "other persons." In addition, because it is not immediately preceded by a narrower description of a class to which certain nondiscrimination provisions apply, there can be little doubt that the phrase "any carrier or other customer" was intended to be read literally. There is certainly no doubt that AT & T falls within the class it delimits.
 
 
 31
 The District Court's interpretation of the MFJ finds additional support in the court's earlier decision in United States v. Western Electric Co., 583 F.Supp. 1257 (D.D.C. 1984). In that case, the court prevented Pacific Bell--a BOC in competition with AT & T--from refusing to provide access lines to coinless telephones that AT & T wanted to install at the Los Angeles airport and other sites in order to compete with Pacific Bell's coinless telephones. The court stated:
 
 
 32
 The decree requires the Operating Companies to grant nondiscriminatory exchange access to all interexchange carriers. That provision was designed to make it impossible for a "bottleneck" monopoly to prevent competitors from providing service by refusing to provide the necessary connections. If ... an Operating Company ... had the authority to determine when it would or would not provide access and to whom, it would become the arbiter of future inter-LATA [Local Access and Transport Area] services; it could shape the inter-LATA competition to suit its needs or interests, and it could frustrate such competition altogether. In short, it could act as the Bell System was alleged to have acted prior to divestiture.
 
 
 33
 Pacific Bell's assertions of authority to refuse to grant access to its lines to AT & T thus not only violate the decree; they strike at its heart.
 
 
 34
 Id. at 1259 (footnotes omitted).
 
 
 35
 If a BOC or a Regional Holding Company were permitted to charge different customers different rates for exchange access or local exchange facilities, depending upon whether those customers purchased other products or services sold by the BOC or Regional Holding Company, then it could, in the court's terms, exploit its "bottleneck" monopoly over exchange access and local exchange facilities to the detriment of its competitors and ultimately of consumers of telecommunications services. The difference between charging a competitor a markedly higher price for access and denying access altogether is, after all, a difference of degree, not of kind. If US West were allowed to employ the pricing practices that AT & T alleged it had used and would continue to use, US West's actions would strike at the MFJ's heart just as surely as did Pacific Bell's denial of exchange access for AT & T's coinless telephones. It is clearly reasonable to read the MFJ's nondiscrimination provisions in light of its fundamental purpose to stymie efforts by a local monopoly to use its stranglehold on essential facilities and services to thwart effective competition in areas where its monopoly position was not protected by the MFJ. The District Court's construction of those provisions, informed by the court's recognition of the MFJ's aims, is therefore a sound and sensible one.
 
 
 36
 In resisting this conclusion, Bell Atlantic and US West object that the MFJ's equal access and nondiscrimination requirements were not intended to apply to "owners of private telecommunications systems." See Brief for Appellant Bell Atlantic at 17 n. 28; Reply Brief at 17-18; Brief for Appellant US West at 29-31. They point out that the District Court, in approving the MFJ, noted that "[s]everal radio common carriers and owners of private communications systems" had contended that section II(A)'s equal access requirements should apply to them, and that the court found "justified the parties' decision not to address these specialized demands." 552 F.Supp. at 196 n. 269.
 
 
 37
 We do not read this footnote as denying either that GSA belongs to the class of "other persons" under section II(B) or that the nondiscrimination requirement of section B(1) of Appendix B may be implicated when a BOC provides GSA with exchange access. First of all, the trial court's discussion in this note refers to the exchange access requirements of section II(A), which confers rights solely upon "all interexchange carriers and information service providers." The court does not refer to the nondiscrimination provision of section II(B), which forms one focus of the present controversy and which uses the broader term "other persons." Second, the trial court's reference in the footnote to the comments of certain owners of highly specialized private networks that provide telecommunications services to industrial users in areas not served by public systems suggests that its statement in the footnote was only addressed to the users of these specialized systems. This inference is bolstered, third, by the court's rejection of the appellants' argument, because the judge who rejected their argument was the very same judge who authored the footnote to which they appealed. In any event, this court is not bound by the District Court's earlier comments about the proper interpretation of some portion of the MFJ. Although there seems to us no conflict between the court's views when it approved the MFJ and when it issued the Order that gave rise to the present case, even if the court's views were at odds we would not be obliged to follow its initial opinion. The appellants' reliance on this footnote is therefore misplaced.[5]
 
 
 38
 B. US West's Need for "Tails"
 
 
 39
 US West argued before the District Court, and again on appeal, that even if the MFJ's nondiscrimination provisions applied to the bids it submitted to GSA, it was not guilty of discriminatory pricing. US West contends that because it would have to purchase a costly "tail" from the end of AT & T's long-distance line to its ETS if it provided the FTS switch, while AT & T would not need a "tail" if its CCSA provided FTS switching, the lower price it offered GSA for exchange access was a legitimate means of reducing the competitive advantage AT & T enjoyed as a result of its supplying the long-distance lines used by GSA.
 
 
 40
 The District Court tersely rejected this argument. "The decree's nondiscrimination provisions," the court said, "do not focus on the question what overall 'packages' the several competitors are able to offer but on the issue whether each element of exchange access provided by a Regional Company is priced equally regardless of who supplies the other elements." United States v. Western Elec. Co., No. 82-0192, slip op. at 5 n. 5 (D.D.C. Nov. 26, 1986), J.A. 22. We agree. Appendix B, section B(1), of the MFJ specifically requires that BOC tariffs "provide unbundled schedules of charges for exchange access [that do] not discriminate against any carrier or other customer." It plainly mandates nondiscriminatory charges for each element of service, not merely nondiscriminatory charges for some combination of services.
 
 C. Dial 8 Lines Provide Exchange Access
 
 41
 US West argues that the Dial 8 lines it allegedly agreed to provide free of charge to GSA if GSA purchased its FTS switching services do not afford "exchange access," and thus that the prices charged for them are not governed by the MFJ's nondiscrimination provisions. Hence, the District Court's Order exceeded the court's authority by requiring the nondiscriminatory pricing of Dial 8 lines. See Brief for Appellant US West at 40-44; Reply Brief at 16-17.
 
 
 42
 We find this argument meritless. First of all, section II(B)(3) does not speak of "exchange access." It simply forbids discrimination between AT & T and other persons in the "interconnection and use of the BOC's telecommunications services and facilities or in the charges for each element of service." There seems little doubt that the lease or purchase of Dial 8 lines from a BOC, which link a Centrex or PBX servicing a Government office to the FTS switch, involves the "use of the BOC's telecommunications service and facilities." To the extent that the District Court's holding rests on section II(B)(3), it is immune from attack on this score.
 
 
 43
 Even if one focuses exclusively on section B(1) of Appendix B, however, the same result follows. That section does refer to "exchange access," which is defined extremely generously in section IV(F) of the MFJ:
 
 
 44
 F. "Exchange access" means the provision of exchange services for the purpose of originating or terminating interexchange telecommunications. Exchange access services include any activity or function performed by a BOC in connection with the origination or termination of interexchange telecommunications, including but not limited to, the provision of network control signalling, answer supervision, automatic calling number identification, carrier access codes, directory services, testing and maintenance of facilities and the provision of information necessary to bill customers.
 
 
 45
 United States v. AT & T, 552 F.Supp. at 228 (reprinting MFJ).
 
 
 46
 We see no reason to upset the District Court's finding that Dial 8 lines are used in "the origination or termination of interexchange telecommunications." Dial 8 lines are necessary, for example, to initiate long-distance calls originating in a Government office and terminating in the local, public exchange network of a city located in a different exchange area. They therefore fall within the MFJ's roomy definition of "exchange access."
 
 
 47
 It warrants emphasis, moreover, that this reading of the MFJ's definition of "exchange access" best serves the purposes of the MFJ. If some arbitrary limitation were read into the definition--as US West suggests we do by excluding all "[f]acilities 'below' the [FTS] switch, such as Centrexes and their connections to the FTS switch," Brief for Appellant US West at 42--then a BOC or a Regional Holding Company could use its monopoly control of whatever services were excluded to obtain an unfair competitive advantage over its rivals. That is precisely the evil the MFJ was designed to forestall.[6]
 
 
 48
 D. The District Court's Alleged Intrusion on State and Federal Regulatory Authority
 
 
 49
 The appellants raise a chorus of complaints about potential conflicts between the District Court's nondiscrimination Order and state and federal regulations. They also contend that the District Court's command that they seek to resolve any conflicts that arise in favor of the court's reading of the MFJ, even though they would prefer not to carry that message to regulatory authorities, infringes their First Amendment right to freedom of speech. They would have us issue a sweeping ruling setting forth the proper domains of the courts, the states, and the FCC, resolving constitutional problems that might arise, and defining the extent to which courts may engage in what they portray as the essentially legislative activity of ratemaking.
 
 
 50
 We are constrained to turn a deaf ear to these complaints. As the Regional Holding Companies' overnight accommodation to the District Court's Order demonstrates, there was in fact no conflict between the Order and state or federal regulations. And the FCC's provisional ruling on access charges in Bell Atlantic Petition, 2 F.C.C. Rcd. at 7458, is in complete accord with the court's Order. Should the FCC alter its position when it completes its rulemaking proceedings on exchange access tariffs and private branch exchange (PBX) surcharges, placing the Regional Holding Companies in a position where continued compliance with the court's Order would cause them to transgress FCC regulations, then the Regional Holding Companies may return to the District Court for relief. If they are dissatisfied with that court's disposition of their claims, they may appeal to this court. Barring an actual conflict, however, we are powerless to act. It is not our function to resolve phantom disputes or to issue dicta on a range of merely hypothetical controversies.
 
 
 51
 E. The District Court's Denial of Bell Atlantic's Motion for Clarification
 
 
 52
 In denying Bell Atlantic's motion for clarification, the District Court wrote: "The legal principles set forth in the November 26 Memorandum are clear. Those principles are not fact-specific, and there is therefore no basis for distinguishing between US West and Bell Atlantic." United States v. Western Elec. Co., Civ. No. 82-0192, slip op. at 2 (D.D.C. Mar. 31, 1987), J.A. 30. It is clear that the trial court acted properly in denying Bell Atlantic's motion for clarification.[7] However, the appellants claim that the trial court's opinion might be read to suggest that the court's first Order not only required the elimination of price discrimination between AT & T and GSA in regard to local exchange access and Dial 8 lines, but that it offered a judgment with respect to other price disparities as well, such as those between residential and commercial customers, or those between interexchange carriers and information service providers, even though such disparities were required by state or federal regulations. We disagree. We express no views on matters that were not directly raised by AT & T's Emergency Motion, and we do not read the trial court's Order and Memorandum to do so. We reiterate that the trial court's Order does not extend beyond the questions presented by the provision of exchange access and Dial 8 lines to GSA at lower rates than those charged to AT & T only to avoid misunderstandings and to allay the appellants' apprehensions.F. Bell Atlantic's Claim of Mootness
 
 
 53
 In its Reply Brief, Bell Atlantic belatedly contended that the parties' dispute over the applicable tariffs for local exchange access had been rendered moot by the FCC's provisional declaratory ruling in Bell Atlantic Petition, 2 F.C.C. Rcd. 7458 (1987). Of the many parties to this case, only Bell Atlantic suggested that the FCC's decision would have this effect. We find the suggestion meritless.
 
 
 54
 AT & T brought suit in the District Court to vindicate its rights under the MFJ. The District Court was the only forum in which AT & T could obtain the relief it sought, and the District Court correctly issued the injunction AT & T requested. Only after the District Court handed down its decision did Bell Atlantic petition the FCC for clarification of the agency's access charge rules, in order to ascertain whether they were in conflict with the District Court's decision. AT & T never sought relief from the FCC, and the FCC did not purport to provide any relief. Indeed, it lacked authority to issue an order of the sort AT & T desired, since it was not empowered to enforce the terms of the MFJ. The FCC merely assured Bell Atlantic that agency regulations were not inconsistent with the District Court's decision. Furthermore, the FCC did not even address the other issue that prompted AT & T's suit in the District Court--the allegedly discriminatory pricing of Dial 8 lines. Thus, the FCC's declaratory ruling can hardly be said to moot AT & T's suit under the MFJ in federal court.[8]
 
 
 55
 The FCC's ruling, moreover, was only a provisional interpretation of its access charge rules. In its Notice of Proposed Rulemaking, issued the same day as its decision in Bell Atlantic Petition, the FCC twice described that decision as "tentative." Amendment of Part 69 of the Commission's Rules Relating to Private Networks and Private Line Users of the Local Exchange, 2 F.C.C. Rcd. 7441, 7447, 7456 n. 71 (1987). The FCC stated that it would consider amending the rules on which its tentative decision was based, and that it therefore wished "to examine this issue in light of the complete record developed in response to this Notice, and in the context of the broader issues concerning the access charge treatment of off-net or 'leaked' traffic from private networks and private lines generally." Id. at 7456 n. 71. The FCC's decision in Bell Atlantic Petition was therefore merely an interim ruling. It did not purport to settle definitively the controversy over the appropriate FCC access charges or tariffs owed by interexchange carriers and owners of private networks using PBXs.
 
 
 56
 More important, it did not purport to settle the parties' dispute over the proper interpretation of the MFJ's nondiscrimination provisions. None of the parties explicitly denies that AT & T's action was properly raised in the District Court, and that the court acted properly in ruling on it. Nevertheless, Bell Atlantic seems to deny this proposition implicitly by arguing, under the guise of a mootness claim, what other appellants assert more forthrightly: that the FCC has primary jurisdiction to resolve all disputes within the compass of the MFJ.
 
 
 57
 In response, two points warrant mention. First, the appellants' primary-jurisdiction argument was not litigated below, and we have no license to address it, whether or not it is clothed in the unassuming garb of a mootness claim. Second, the extensive case law growing out of the AT & T divestiture tacitly rejects the critical premises underlying the appellants' primary-jurisdiction argument. The District Court has repeatedly decided suits brought under the MFJ, even though the questions they raised might have overlapped certain areas within the FCC's jurisdiction. Until the Supreme Court instructs us that the District Court no longer possesses authority to resolve disputes arising under the MFJ, we see no reason to doubt that the District Court acted properly in this case and in similar cases. The MFJ supplies a basis for suit independent of FCC regulations and Code provisions under which they are promulgated. It comprises different standards, and affords different forms of relief. And, most importantly, the FCC has no original or primary jurisdiction to construe or apply the terms of the MFJ. Disputes under the MFJ are matters for the court to decide, just as was the original lawsuit that led to the MFJ. The present action was properly before the District Court, and the FCC's tentative declaratory ruling cannot render its decision nugatory, whether by providing similar (albeit only provisional) relief or by displacing the District Court's jurisdiction.
 
 III. CONCLUSION
 
 58
 The District Court was correct in ruling that the MFJ's nondiscrimination provisions bar a Regional Holding Company from offering exchange access and Dial 8 lines to GSA at rates below those which AT & T would have to pay for the same services. The court also acted properly in denying Bell Atlantic's motion for clarification and a stay. We therefore affirm both of the District Court's Orders, with the qualification noted in section II(E) of this opinion.
 
 
 59
 Affirmed.
 
 STARR, Circuit Judge, dissenting:
 
 60
 It has rightly been said that federal courts are not "self-directed boards of legal inquiry and research." Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir.1983). Then-Judge Scalia's wise caveat about the proper role of the Third Branch is entirely appropriate here, for the question resolved by my colleagues has, in my view, been rendered moot by virtue of the supervening action of the Federal Communications Commission providing the very relief to AT & T which it had sought under the terms of the MFJ. Under settled principles of law, this undisputed fact has the inexorable legal consequence of resolving the dispute which gave rise to AT & T's repairing to Judge Greene's courtroom in the first instance. I therefore respectfully dissent.
 
 
 61
 * Before entering the labyrinthine maze of switches, access charges and the like, it behooves us to reflect on one fundamental precept with which the court, I believe, agrees, since it fails directly to call it into question: It cannot reasonably be gainsaid that action by a regulatory agency moots an appeal when the agency grants the same relief sought through judicial action. It matters not that the issues before the trial court and the regulatory agency are not precisely the same or that court and agency reach their (identical) results through interpretation of different bodies of law (or of consent decrees). After all, the core value informing mootness doctrine is that a dispute, once live, has, for whatever reason, disappeared. The cold, hard fact is that AT & T has now been given administratively the relief it had sought judicially. That terminates the controversy and brings to an end the exercise of judicial power.
 
 
 62
 A couple of cases serve to make this rather straightforward point. For example, in Iowa Power & Light Co. v. Burlington Northern, Inc., 647 F.2d 796 (8th Cir.1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982), the court dismissed as moot an appeal of a contract enforcement action solely because the Interstate Commerce Commission had published a decision holding that the rate agreed to by the parties was just and reasonable within the meaning of applicable statutory provisions. Accordingly, the appeals court dismissed the action as moot and vacated the District Court's judgment. Detroit Fire Fighters Ass'n v. Dixon, 572 F.2d 557 (6th Cir.1978) is also illustrative. There, certain plaintiffs alleged that Detroit's fire department had engaged in racially discriminatory conduct. The District Court agreed and entered an injunction. While the fire department's appeal was pending, an arbitrator concluded that the practices which the trial court had condemned as discriminatory were also violative of a governing collective bargaining agreement. State court orders approving the arbitrator's award and finding an unlawful labor practice therefore mooted the federal case on appeal. The Sixth Circuit ordered the District Court's injunction (which had prospective effect beyond the life of the collective bargaining agreement) dissolved, notwithstanding plaintiff's arguments that the District Court's injunction afforded it greater relief than the State Court's orders.[1]
 
 
 63
 Now, back to the case at hand. Here, the FCC has concluded that its "present rules should be interpreted to require customers of Centrex-ETS service to pay FGA access charges for the termination of off-net calls, rather than local exchange rates and the special access surcharge." Bell Atlantic Petition, 2 F.C.C. Rcd. 7458, 7460 (1987) (emphasis added).[2] In arriving at that conclusion, the FCC reasoned as follows:
 
 
 64
 [T]he Centrex-ETS service ... should be treated like CCSA service for purposes of the access charge rules. It is clear that the BOCs are offering Centrex-ETS in direct competition with CCSA services and that the two services are very similar in terms of the functions they perform. Thus according different access charge treatment to the two services would raise serious competitive concerns.
 
 
 65
 Id. Through interpretation of its own regulations, therefore, the FCC concluded that local access charges must be the same regardless of whether a CCSA switch supplied by AT & T or a Centrex-ETN switch supplied by a BOC was employed.
 
 
 66
 With respect to local access charges, the FCC's interpretation worked the very result that AT & T sought from the District Court. Under the FCC's order, the BOCs came under the obligation to charge the same rate for local access, regardless of whether GSA purchased its switch from AT & T or a BOC. This relief differs not one whit from the District Court's order requiring US West to "provide exchange access ... for the Federal Telecommunications System (FTS) network and other private networks at the same rates, regardless of which carrier a customer selects to provide switching functions." J.A. at 27.
 
 
 67
 The District Court's order also requires "other local exchange facilities" to be priced identically. This, I assume, refers to the Dial 8 trunk lines, which my colleagues feature extensively and which I discuss below. To the extent that it is intended to govern other, unspecified situations, the order sweeps in matters that were not squarely presented to the District Court, and thus were unripe for judicial resolution. Indeed, the District Court has not heretofore been unmindful of these very concerns. As Judge Greene has wisely observed, the trial court is not to be in the business of issuing advisory opinions on the interpretations of various consent decree provisions:
 
 
 68
 In the absence of an actual controversy and without the benefit of the Department [of Justice]'s position on many of these issues, the Court is unwilling to render an advisory opinion on these hypothetical and tangential matters.
 
 
 69
 United States v. Western Elec. Co., C.A. 82-0192, slip. op. at 7-8 (D.D.C. June 28, 1985), quoted in Memorandum in Support of Motion for Clarification of Bell Atlantic's Obligations Under the Memorandum Opinion of November 26, 1986 and Request for a Stay at 5 (Dec. 23, 1986); J.A. at 276. This is as it should be, for generalist courts are singularly ill-situated to regulate complex industries under the rubric of a solitary consent decree resolving a single (albeit important) lawsuit.
 
 
 70
 On this point, my colleagues and I are in happy accord. As the court today holds, "the trial court's Order does not extend beyond the questions presented by the provision of exchange access and Dial 8 lines to GSA at lower rates than those charged to AT & T." Maj. op. at 1431. Thus, whether the relief afforded to AT & T is grounded in the consent decree or in the FCC's interpretation of its own regulations, the result is the same: GSA will be charged identical local access rates, regardless of which switch it elects to purchase. The dispute with respect to local access rates, hotly contested in the District Court, is simply no longer a live controversy.
 
 II
 
 71
 As Bell Atlantic itself concedes, the FCC's order does not address itself to the Dial 8 lines and therefore does not moot that controversy. That issue, however, was not squarely resolved by the District Court's opinion and, as the case comes to us, is unripe for disposition. AT & T's principal complaint before the trial court concerned the disparate access charges; at the same time, AT & T claimed that US West's bid for Centrex-ETN switching services failed to cover the cost of Dial 8 trunks (or "intermachine" lines). Memorandum in Support of AT & T's Emergency Motion to Compel US West to Comply with Nondiscrimination Requirements of Decree at 4, 6-7 (Nov. 6, 1986); J.A. at 39, 41-42. In response, US West claimed that its bid to GSA did indeed cover these costs. US West Memorandum in Opposition to AT & T's Emergency Motion to Compel US West to Comply with Nondiscrimination Provisions of Decree ("US West Opposition") at 17-18 (Nov. 18, 1986); J.A. at 196-97. The District Court never squarely resolved this issue; instead, the trial court's order required, generally, US West to price "other local exchange facilities" at the same rates. But there was no determination either that Dial 8 lines were in fact local exchange facilities (an issue contested by the parties on appeal) or that US West's pricing had not been at the "same rate" in its bid to GSA. Indeed, so minor was the role of Dial 8 lines in this drama that the District Court did not even refer to them at all in the course of its analysis. For all we can tell, the District Court simply did not focus on the issue (nor, in fairness, did it have occasion to).
 
 
 72
 In one sense, the disparity of treatment in the local access charges was factually an easy case. There was no cost difference for the BOC regardless of whether the BOC or AT & T supplied the switch. A different price necessarily meant, as the trial court saw it, price discrimination, at least with respect to that element of service; the only real question was the legal one of whether such disparities were covered by the MFJ. Not so with Dial 8 lines. The cost to the BOC may be significantly different depending on whether AT & T or the BOC supplies the switch. Thus, a price disparity in this setting does not necessarily mean a price discrimination.[3] To so conclude would require factual findings, which as we have seen are entirely lacking in this case (again, through no fault of Judge Greene).[4]
 
 
 73
 Under these circumstances, "the appropriate course of action is to vacate the judgment and remand the case." Rule v. International Ass'n of Bridge, Etc., Workers, 568 F.2d 558, 568 (8th Cir.1977). This is certainly the appropriate disposition here, where the entire focus of the case has been mooted by the FCC's order and the present record is inadequate to render judgment as to the Dial 8 lines.
 
 III
 
 74
 US West claims that the case is not moot for two separate reasons. First, US West argues that "[t]he Memorandum Opinion and Order is only a tentative interim decision pending completion of the rulemaking proceeding commenced at the same time; in contrast, the District Court's Orders would be effective indefinitely, and indeed they substantially preempt the outcome of the rulemaking proceeding." Reply Brief for US West at 11-12. There is, admittedly, a grain of truth to this. But it is only a grain.
 
 
 75
 The FCC issued a Notice of Proposed Rulemaking, together with its order mandating equal access charges. But fairly read, the thrust of the NOPR is to invite comment on the "larger set of issues relating to the appropriate access charge treatment of private networks and private line users generally." 2 F.C.C. Rcd. 7458, 4762 n. 29 (1987). In particular, the FCC was concerned with the impact that its treatment of Centrex-ETS would have on PBX-ETS, a competitive system. Since "concerns about discrimination, efficiency, and enforcement" motivated the FCC to issue the NOPR in the first place, see Amendment of Part 69 of the Commission's Rules Relating to Private Networks and Private Line Users of Local Exchange, 2 F.C.C. Rcd. 7441, 7442 (1987), it would appear highly unlikely that the FCC would overturn the basic thrust of its Dec. 18, 1987 order, which was to eliminate "unreasonable discrimination and undue preferences among rates for interstate services." Bell Atlantic Petition, supra, 2 F.C.C. Rcd. at 7458. But, even more basically, the FCC's order now appears final. By my reckoning, the time for appeal has expired, and none of the parties has informed us that judicial review has in fact been sought.
 
 
 76
 Second, US West argues that "the District Court's Orders appear to impose requirements with respect to both exchange access charges and charges for facilities used solely for intra-network purposes (the 'Dial 8' trunks); the FCC's Order deals only with the former, not at all with the latter subject. Because the FCC's Order is not coextensive with the District Court's Orders, it cannot moot them." Reply Brief for US West at 12. But as explained above, the District Court made no specific findings with respect to the Dial 8 lines, and this aspect of the case is not ripe for review.
 
 
 77
 For its part, AT & T claims that the case is not moot for two reasons. Neither has merit. First, AT & T claims that the argument for mootness "rests on a single false premise: that the relief sought by AT & T's emergency motion was the construction of the FCC's access charge regulations that was issued on December 18, 1987." Supplemental Brief of AT & T at 4-5. AT & T claims that this was not its aim; if it were, AT & T would have gone to the Commission in the first instance rather than to court. Moreover, that relief is "[in]sufficient to prevent discrimination against AT & T in the future." Id. AT & T argues that "[n]othing in the FCC's Order prevents US West from developing another switching service that is also functionally and competitively identical to AT & T's CCSA services ... and again unilaterally exempting its switching service customers from the federal access charges that apply to the services of US West's inter-exchange competitors." Id. at 6. But this mini-parade of horribles is, of course, like other such parades. It is mere speculation. It is manifestly a hypothetical situation that courts wisely refrain from addressing.
 
 
 78
 Second, AT & T contends that the case is not moot because "the District Court's decision is a holding that US West violated the Decree in the past." AT & T maintains that because "[t]he question of the appropriate sanctions for US West's past conduct is now pending, ... the FCC's December 18th Order cannot moot this controversy." Id. at 7-8.
 
 
 79
 While we are indeed told that the Department of Justice is "considering" whether to seek sanctions, that issue will obviously be taken up in separate proceedings if and when the Department decides to seek them. The request lodged by AT & T seems to be dying on the vine; there is not the slightest indication that the Department is in fact going to act favorably on it. Transcript of Oral Argument at 72. And the mere possibility of such proceedings cannot create jurisdiction over an otherwise moot case.
 
 
 80
 In the meantime, contrary to AT & T's assertions, the District Court's opinion clearly does not reach any conclusions with respect to past violations of the consent decree. AT & T sought, and the District Court granted, prospective relief only in the form of a declaratory judgment.[5]
 
 
 81
 Finally, the court suggests that the mootness claim boils down to a contention that the FCC has primary jurisdiction in this case. Not so. Holding this case moot does not depend on a conclusion that the FCC has primary jurisdiction over local access rates. Indeed, the court's suggestion to the contrary highlights a basic error in its analysis. The court appears to reason that the mootness claim and primary jurisdiction argument amount to the same contention because the District Court and the FCC operated under different jurisdictional bases, and the potential remedies that each had to offer differed. The court's position thus appears to be that the FCC's action, taken in the course of construing its own statutory mandates, can never moot the District Court's orders. It matters not, in my colleagues' view, that the actual relief granted by the agency is the same as that given by the trial court. This reasoning goes further than simply rejecting the argument, advanced most vigorously by Ameritech, that the FCC has primary jurisdiction in matters in which the FCC and MFJ overlap. Indeed, this reasoning goes well beyond that, carrying it (apparently) to the position that the District Court has exclusive jurisdiction whenever the court and agency exercise their separate jurisdictions in overlapping areas of the MFJ and the Communications Act. Whatever the exact relationship between the District Court's rulings and the FCC's orders in cases of actual conflict, all that is needed to dispose of this case is to recognize that the District Court and the FCC have concurrent jurisdiction over local access rates.[6] This, the court, in effect, refuses to do.
 
 IV
 
 82
 A final word. My colleagues' construction of the term "other persons" in Section II(B)(3) of the MFJ is deeply troublesome.[7] Specifically, the opinion construes "other persons" to encompass GSA. Maj. op. at 1427. But this construction confronts head on the objection, advanced most vigorously by Pacific Telesis, that the MFJ's prohibitions against price discrimination were not intended to cover "private networks" such as GSA's. Today's bold construction thus broadens significantly the possible reach of the term "other persons" and in so doing creates (seemingly) a far reaching requirement for broad price uniformity not mandated by the MFJ.
 
 
 83
 That the MFJ was not intended to cover local access by private network facilities is evidenced by the District Court's decision approving the MFJ, in which the court found "justified the parties' decision not to address" the demands of private networks for "equal access requirement[s]" that would apply to them. United States v. AT & T, 552 F.Supp. 131, 196 n. 269 (D.D.C.1982), aff'd mem. sub. nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).
 
 
 84
 The court's response to these objections is unsatisfying. It addresses the argument as follows:
 
 
 85
 [T]he trial court's discussion in this note [552 F.Supp. at 196 n. 269] refers to the exchange access requirements of section II(A), which confers rights solely upon "all interexchange carriers and information service providers." The court does not refer to the nondiscrimination provision of section II(B), which forms one focus of the present controversy and which uses the broader term "other persons."
 
 
 86
 Maj. op. at 1429. The opinion adds that "[i]n any event, this court is not bound by the District Court's earlier comments about the proper interpretation of some portion of the MFJ." Maj. op. at 1429.
 
 
 87
 Although technically correct--the District Court refers to section II(A) only--it seems anomalous at best for the District Court to have rejected coverage under the MFJ for private carriers via section II(A), while at the same time intending private networks to gain the same rights through section II(B). Moreover, Appendix B, upon which the opinion also relies and which contains the language most favorable to AT & T's position, is only incorporated into the MFJ through section II(A), not section II(B). The most natural reading of the MFJ is that private networks were not intended to be covered by the MFJ's antidiscrimination provisions at all.
 
 
 88
 The better interpretation would be to construe "other persons" to encompass the BOCs themselves. To be sure, this construction has its own problems. For example, if "other persons" is read to include the BOCs, section II(B)(2) would logically require the BOCs to treat AT & T no differently from themselves in the establishment and dissemination of technical information--an obvious anomaly.[8] In the final analysis, it seems the better course to admit that section II(B) does not, by its terms, support AT & T's position but that Appendix B, the underlying purposes motivating the decree, and its more recent "judicial gloss" all look the other way and point in AT & T's favor. Without expressing my own views as to the ultimate outcome on the merits of this case, this analysis of "other persons" at least has the advantage of not unnecessarily broadening the scope of the MFJ's coverage. In contrast, the court's opinion today appears to leave MFJ coverage broader and more uncertain than did Judge Greene's opinion, which was after all rendered under rather exigent circumstances.
 
 
 89
 * * *
 
 
 90
 * * *
 
 
 91
 For the foregoing reasons, I respectfully dissent.
 
 
 
 [1]
 US West is one of the seven Regional Holding Companies that were assigned ownership of the twenty-two Bell Operating Companies ("BOCs") when AT & T divested itself of them. References to US West and other Regional Holding Companies include their BOC subsidiaries
 
 
 [2]
 The MFJ is reprinted following the District Court's opinion approving, with modifications, the antitrust settlement agreement between AT & T and the Government. See United States v. AT & T, 552 F.Supp. 131, 226 (D.D.C.1982), aff'd mem. sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983)
 
 
 [3]
 AT & T has asked the Department of Justice to institute enforcement proceedings against US West for its alleged violations of the MFJ. The Justice Department has not concluded its investigation. See Brief of Defendant-Appellee AT & T at 12-13
 
 
 [4]
 This prohibition extends with equal force to the seven Regional Holding Companies. See United States v. Western Elec. Co., 797 F.2d 1082, 1087-89 (D.C.Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987)
 
 
 [5]
 We are equally unimpressed by the appellants' invocation of a line from the Competitive Impact Statement issued by the Department of Justice which reads: "Taken together, the non-discrimination provisions are designed to ensure that the divested BOCs do not abuse their status as regulated franchised monopolies to disadvantage competitors of AT & T in the provision of intercity services, information services, or in the provision of telecommunications equipment for purchase by a BOC or its customers." Competitive Impact Statement, 47 Fed.Reg. 7175-76 (1982). Although the Justice Department's views are relevant to a proper interpretation of the MFJ, there is no indication that the Justice Department intended the foregoing sentence to be a definitive, comprehensive statement of the MFJ's reach. Indeed, the very next sentence reads: "It is therefore the intent of the Department of Justice that this provision be construed broadly to encompass all potential areas of favoritism, subtle as well as overt, that may arise in relationships between the divested BOCs and AT & T and its competitors." 47 Fed.Reg. 7176. In view of this countervailing statement and the Competitive Impact Statement's imprecision, we decline to alter our reading of the MFJ based solely on the sentence highlighted by the appellants
 
 
 [6]
 In this regard, it is important to note that the District Court's Order has only prospective effect. It bars the discriminatory pricing of Dial 8 lines, without finding conclusively that US West earlier engaged in price discrimination in bidding successfully for four FTS switching contracts in 1985. The question whether US West violated the MFJ at that time remains open
 
 
 [7]
 None of the parties has objected specifically to the District Court's refusal to grant a stay, and we see no reason to fault the court for not doing so. Accordingly, we affirm that portion of the court's Order as well
 
 
 [8]
 The two cases cited in dissent do not offer authority to the contrary. Iowa Power & Light Co. v. Burlington Northern, Inc., 647 F.2d 796 (8th Cir.1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982), involved a dispute between a power company and a railroad over the proper rate for shipping coal between a mine and a generating plant. When the railroad attempted to charge more than the rate the parties had agreed upon, the power company complained to the Interstate Commerce Commission ("ICC"). The ICC ruled initially that the railroad could charge more than the contract rate, although not as much as it would have liked. Only when it was denied relief by the ICC did the power company repair to federal court. It sought an injunction forbidding the railroad from breaching its contract. The district court denied injunctive relief, a divided panel of the court of appeals reversed, and, shortly thereafter, decided to rehear the case. While the petition for rehearing was pending, the ICC requested and received a remand of its earlier decision, which was the subject of a petition for review in the same court of appeals. Upon reconsideration, the ICC concluded that it had erred. It thereupon prohibited the railroad from charging more than the contract rate. Because the power company obtained from the ICC what it had sought in federal court after being rebuffed by the ICC--enforcement of its contract--the court of appeals dismissed the power company's contract action as moot
 Iowa Power & Light differs from the instant case in several salient respects. The same party there sought relief from both the agency and the courts, and it did so on the basis of substantially the same legal arguments. AT & T never petitioned the FCC for a ruling on the application of its regulations, and the arguments it made in the District Court differed markedly from those it might have made before the FCC, as did the relief it requested. In Iowa Power & Light, the power company secured exactly the same relief from the ICC that it had sought in court; AT & T was not awarded any relief by the FCC, and the FCC's declaratory ruling assuaging Bell Atlantic's fears of a conflict between the District Court's order and FCC regulations falls far short of the durable remedy that AT & T obtained under the MFJ in court. The dispute in Iowa Power & Light, moreover, was centered in the ICC. The power company's suit for an injunction after it lost before the ICC was an attempt to circumvent the ICC's ruling, and it is by no means clear, as the courts' disagreements reveal, that the courts had jurisdiction to entertain the power company's suit. In this case, by contrast, AT & T properly sought relief in the District Court, whose authority to hear the case was plain. It was another party--Bell Atlantic--that subsequently went to the FCC. And it did so not in an attempt to undercut the District Court's order, but to ensure that FCC regulations were in accord with it and, if they were not, to request that the FCC modify those regulations to align them with the court's order. See 2 F.C.C. Rcd. at 7458 p 4. The FCC did not purport to pass judgment on the question the District Court confronted, nor did it pretend to intrude on the court's authority or to grant the same remedy the court had already given. This is a far cry from the situation in Iowa Power & Light, where the court could--at best--have issued the same order that the agency had already issued.
 Detroit Fire Fighters Ass'n v. Dixon, 572 F.2d 557 (6th Cir.1978), is even feebler authority. A firefighters union filed three suits to enjoin the promotion of 36 minority employees in violation of a collective bargaining agreement. The union first obtained a preliminary injunction from the district court. While an appeal was pending, an arbitrator found that the proposed promotion offended the collective bargaining agreement to which the union was a party, and a state court issued a preliminary injunction requiring the defendants to comply with the arbitrator's award. Also, while the appeal was pending in federal court, the union obtained a ruling from a state agency that the promotion constituted an unfair labor practice under state law, along with a state court order enforcing the agency's decision. When the federal court of appeals came to review the district court's grant of a preliminary injunction, there was nothing left for it to do, since all of the parties conceded that the case was moot. See id. at 559. The court therefore had no alternative but to dismiss the case and vacate the decision of the district court. United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). Detroit Fire Fighters Association therefore affords no parallel to the instant case, where the FCC did not purport to supply relief, where the effect of its ruling differed from that given by the District Court, where AT & T did not even petition the FCC for a favorable ruling, and where all of the parties, save one, rightly insist that AT & T's suit under the MFJ is still very much alive.
 
 
 [1]
 My colleagues attempt to distinguish these cases on their facts, but does so on points irrelevant to the analysis required under mootness doctrine. For example, the court's observations that, unlike the situation in Detroit Fire Fighters Ass'n, AT & T did not petition the FCC for a favorable ruling or that only one party argued that the case is moot are, with all respect, beside the point. The significance of these cases is that they show instances in which the same relief, derived from construction of a different body of law, has mooted the underlying controversy. Cf. Arrow Honor Society v. Heckler, 464 U.S. 67, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983) (a University's clearly articulated policy that it would ban an all-male honor society from campus until it discontinued its discriminatory membership policy--regardless of the outcome of the lawsuit before the Court--mooted the honor society's suit challenging the agency's determination that federal law and agency regulations required the University to ban the honor society from campus); Douglas v. Donovan, 704 F.2d 1276 (D.C.Cir.1983) (agency appeal mooted by out-of-court settlement reached by private parties)
 
 
 [2]
 The FCC's decision was released December 18, 1987--after opening briefs of appellants and appellees in this case were required to be filed
 
 
 [3]
 Dial 8 lines are conceptually the same as "tails." As US West originally argued in its opposition to AT & T's emergency motion, "AT & T would have the Court impute to US West and its customers additional (and in fact duplicative) trunk costs which are in fact not real, a ploy that it successfully urged the FCC to reject when MCI made the same request regarding the 'tails' it has to pay for connection to an AT & T CCSA switch." US West Opposition at 18; J.A. at 197
 US West argued that although it had agreed to supply GSA the Dial 8 trunk lines at "no extra charge," that was only because it was cheaper to offer GSA Centrex and ETN services in two machines rather than one, and "the trunk costs between the machines are fully covered in the price GSA is paying." US West Opposition at 18; J.A. at 197.
 
 
 [4]
 The District Court held: "The fact is that if identical service is provided by an interexchange carrier and a Regional Company, the decree requires the application of the same access rates, regardless of differences in network configurations." Slip op. at 5; J.A. at 22
 
 
 [5]
 Notably, neither US West nor AT & T challenges Bell Atlantic's argument with respect to the Dial 8 lines; both recognize that the heart of the matter is the local access charges
 
 
 [6]
 If anything, considerations of comity argue quite the other way, namely in favor of exercising our discretionary power to hold this case moot (even if the FCC's actions had not already completely mooted this controversy). See, e.g., Montgomery Environmental Coalition v. Costle, 646 F.2d 568 (D.C.Cir.1980) (dismissing petition for review of EPA decision on grounds of mootness and federal-state comity); Chamber of Commerce of the United States v. United States Dep't of Energy, 627 F.2d 289, 291 (D.C.Cir.1980) (affirming dismissal of suit by district court on discretionary grounds of mootness: "In some circumstances, a controversy, not actually moot, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant.")
 
 
 [7]
 Section II(B)(3) proscribes discrimination by a BOC "between AT & T ... and other persons ... in the interconnection and use of the BOC's telecommunications service and facilities or in the charges for each element of service."
 
 
 [8]
 Section II(B)(2) requires that "[n]o BOC shall discriminate between AT & T ... and other persons ... in the ... establishment and dissemination of technical information and procurement and interconnection standards."